314 So.2d 51

Thomas F. FLETCHER et al., etc.

v.

**TUSCALOOSA FEDERAL SAVINGS AND LOAN ASSOCIATION.**

SC 1100.

Supreme Court of Alabama.

May 22, 1975.

Drake, Knowles & Still, University, for appellants.

Rosen, Wright, Harwood & Albright, Tuscaloosa, for appellee.

Isaac P. Espy, Tuscaloosa, for amicus curiae David P. Thompson and Sarah M. Thompson, in support of appellants.

Robert J. Russell, Montgomery, for amicus curiae Ala. Ass'n of Realtors; Odom,

Argo & Enslem, Montgomery, for amicus curiae Ala. League of Sav. Ass'ns; Shannon, Odom, Robertson & Jackson, Birmingham, for amicus curiae Ala. Mortgage Bankers Assn.; C. John Holditch, Birmingham, for amicus curiae Cobbs, Allen & Hall Mortgage Co., Inc.; James M. Tingle, Birmingham, for amicus curiae Collateral Investment Co.; Spain, Gillon, Riley, Tate & Etheredge and John P. McKleroy, Jr., Birmingham, for amicus curiae Johnson-Rast & Hays Co., in support of appellee.

ALMON, Justice.

Appellants, plaintiffs below, filed suit in circuit court seeking declaratory relief upon an indebtedness which was allegedly usurious under existing state law. The suit was styled as a class action; the members of such class being composed of all persons loaned money by appellee, Tuscaloosa Federal Savings and Loan 'Association, the principal on such loan being greater than $2,000.00 and less than $100,000.00 and at an interest rate in excess of 8% per annum.

The promissory note upon which appellants obligated themselves to appellee reads in pertinent part:

"FOR VALUE RECEIVED, WE promise to the TUSCALOOSA FEDERAL SAVINGS AND LOAN ASSOCIATION, TUSCALOOSA, ALABAMA, its successors and assigns, at its offices in the City of Tuscaloosa, the sum of ELEVEN THOUSAND, SIX HUNDRED AND NO/100____ Dollars, ($11,600.00--), with interest at the rate of Nine (9%) _____ per centum payable in monthly payments of ONE HUNDRED-FOUR AND 37/100 -- DOLLARS (104.37_____) on the 6th day of each and every month commencing June 1, 1974, each of said payments to be applied first to the payment of interest on the then unpaid balance of principal and the remainder of said payments to be applied upon the principal indebtedness un-

til the entire indebtedness and interest has been paid in full."

The specific relief sought in appellants' complaint is a declaration "that [appellants and members of appellants' class] owes [appellee] only the principal amount borrowed on each note which charges interest greater than eight percent."

A motion to dismiss was interposed by appellee. In addition to alleging that appellants' complaint failed to state a claim upon which relief can be granted, appellee's grounds for its motion to dismiss were, *inter alia,* (1) no charge of usurious interest rates as a matter of law, and (2) an absence of the general prerequisites for maintaining a class action under ARCP 23(a)(1)–(4) or the specific requirements of ARCP 23(b)(3).

Prior to the hearing on appellee's motion to dismiss, the parties entered into a stipulation of facts which in essence provided that; (1) appellee had loaned appellants monies secured by a mortgage on real property, (2) the interest on that loan *exceeded* the amount allowed by Tit. 9, § 60, Code of Alabama, 1940, Recompiled 1958, and (3) such interest was *within* the maximum finance charge permitted by Section 2, Act No. 2052, 1971, p. 3290, as codified Tit. 5, § 317, Code, supra.

The trial court, in the light of the foregoing stipulated facts coupled with appellee's 12(b)(6) motion to dismiss, treated the latter as a Rule 56 motion for summary judgment and without opinion (or a ruling on the maintainability of the suit as a class action), granted the motion.

On appeal, the sole assignment of error before us is the granting of summary judgment by the trial court.

Dispositive of the controversy is whether the legislature intended that Tit. 5, § 316 et seq., Code, supra (hereinafter, the Mini-Code) repeal those portions of Tit. 9, § 60 et seq., Code, supra (hereinafter, the Usury Law) which are repugnant. We hold that it did.

**176**

At the outset it is clear to us that the express language of the Mini-Code manifests a clear legislative intent that it apply to real estate mortgage loans: (1) Tit. 5, § 340, expressly makes "any loan, forbearance, or credit sale involving an interest in real property or the sale, lease or *mortgage of an interest in real property,* . . . .." (Emphasis ours), subject to the maximum "finance charge" provisions of Tit. 5, §§ 316(a), 317. (2) Tit. 5, § 317, in turn speaks of "[t]he maximum finance *for any* loan or forbearance and for *any* credit sale." (Emphasis ours). (3) Finally, Tit. 5, § 316(a) states that in determining the permissible finance charge "any discount or point paid by debtor in connection with a *mortgage loan on real estate,* even though paid at one time, shall be spread over the stated term of the loan or forbearance or credit sale." (Emphasis ours).

The intention of the legislature must primarily be determined from the language of the statute itself. Where, as here, that language unambiguously calls for inclusion of loans on real estate mortgages, other rules of statutory construction are thereby rendered subordinant in the determination of legislative "intent." In re Opinion of the Justices, 267 Ala. 114, 117, 100 So.2d 681, (1958); Alabama Industrial Bank v. State ex rel. Avinger, 286 Ala. 59, 62, 237 So.2d 108, (1970); State ex rel. Moore v. Strickland, 289 Ala. 488, 493, 268 So.2d 766, (1962); State v. Lamson & Sessions Company, 269 Ala. 610, 114 So.2d 893, (1959). There is a strong presumption that the legislature did not do a futile thing when it expressly brought real estate mortgage loans within the regulatory purview of the Mini-Code. In re Opinion of the Justices, supra.

Looking to the provisions of the Usury Law which are inharmonious with the finance charge provisions of the Mini-Code, Tit. 9, § 60, provides in pertinent part:

". . . [T]he rate of interest by written contract is not to exceed eight dollars upon one hundred dollars for one year; . . .."

By contrast the Mini-Code's definition of "finance charge," Tit. 5, § 316(a), reads:

"'Finance charge' shall include all charges payable directly or indirectly by the debtor and imposed directly or indirectly by the creditor as an incident to the extension of credit, including interest, time price differential, points or discount paid directly by the debtor, service, carrying or other charge however denominated, loan fee, credit or investigation fee, . . .."

In turn, Tit. 5, § 317, then sets as a maximum finance charge the following:

"The maximum finance charge for any loan or forbearance and for any credit sale (except under open end credit plans) may equal but may not exceed the greater of the following:

. . . . . .

"(b) If the original principal amount of the loan or original amount financed exceeds $2,000, $8 per $100 per year of the original principal amount of the loan or amount financed.

"The maximum finance charge under paragraphs (a) and (b) shall be determined by computing the maximum rates authorized by paragraphs (a) and (b) on the original principal amount of the loan or original amount financed for the full term of the contract without regard to scheduled payments and the maximum finance charge so determined (or any lesser amount) may be added to the original principal amount of the loan or original amount financed."

The same subject matter, interest, is dealt with in an inconsistent manner in the foregoing provisions of the Usury Law and the Mini-Code. This Court in Allgood v. Sloss-Sheffield Steel & Iron Co., 196 Ala. 500, 501, 71 So. 724, (1916) held:

"'Where an amendment is made that changes the old law in its substantial

provisions, it must, by a necessary implication, repeal the old law so far as they are in conflict. And where a new law, whether it be in the form of an amendment or otherwise, covers the whole subject-matter of the former, and is inconsistent with it, and evidently intended to supersede and take the place of it, it repeals the old law by implication.' " (Citations omitted).

■ By reference to the prevailing conditions in the state and national money markets in 1971, the year in which the Mini-Code was enacted, we have no hesitation in reaching the conclusion that the legislature ' clearly intended that it should cover the entire field of regulation of real estate mortgage loans made by institutions subject to the "finance charge" ceilings contained therein.[1] Inasmuch as the legislature sought to deal comprehensively with this mode of credit transaction and by including provisions in the Mini-Code incompatible with the 8% simple interest ceiling of the pre-existing Usury Law, the Mini-Code repealed by implication the repugnant sections of the old statute. Such is the rule in this state. Vaughan v. McCartney, 217 Ala. 103, 115 So. 30 (1927).

■ Repeal by implication is admittedly not a favored rule of statutory construction, but in State v. Bay Towing and Dredging Company, 265 Ala. 282, 289, 90 So.2d 743, 749 (1956), we find:

"In Alabama, the law governing implied repeals is well-settled and the cases on this point are singularly consistent. See 18 Ala.Dig., Statutes, Key 159 &

160. A concise statement of the rule is contained in City of Birmingham v. Southern Express Co., 164 Ala. 529, 538, 51 So. 159, 162:

" 'Repeal by implication is not favored. It is only when two laws are so repugnant to or in conflict with each other that it must be presumed that the Legislature intended that the latter should repeal the former. * * *' "

"Implied repeal is essentially a question of determining the legislative intent as expressed in the statutes. Ex parte Jones, 212 Ala. 259, 260, 102 So. 234. When the provisions of two statutes are directly repugnant and cannot be reconciled, it must be presumed that the legislature intended an implied repeal, and the later statute prevails as the last expression of the legislative will. Union Central Life Insurance Co. v. State, 226 Ala. 420, 423, 147 So. 187; Fidelity & Deposit Co. of Maryland v. Farmers' Hardware Co., 223 Ala. 477, 479, 136 So. 824."

In holding that the maximum legal interest rates of the Usury Law and the maximum finance charges of the Mini-Code are irreconcilable under the facts of this case, we are not unmindful of the persuasive argument of appellant in brief that the two provisions can be ascribed mutually exclusive fields of operation thereby avoiding any repeal by implication. Specifically, that as interest is only one component of the Mini-Code's definition of "finance charge," it is still subject to the legal maximum rate of the Usury Law—the remaining finance charges authorized by the

1. To assist the Court in arriving at this conclusion, there is ample authority that we look not only to the prevailing economic situation at the time of its enactment, but the economic consequences a particular construction might entail as well. League of Women Voters v. Renfro, 292 Ala. 128, 290 So.2d 167, (1974); State v. AAA Motor Lines, Inc., 275 Ala. 405, 155 So.2d 509, (1974); Mitchell v. McGuire, 244 Ala. 73, 12 So.2d 180 (1943); Baggett v. Webb, 46 Ala.App. 666, 248 So.2d 275, (1971). Regarding the former, we are willing to take judicial notice of the fact that by 1971 interest rates on the national money market were rapidly approaching and in many cases had already exceeded those of our own usury law. In order for there to be a continuing supply of mortgage money available for in-state borrowers, action by the legislature was imperative. Within the confines of well-established rules of statutory construction, we are naturally inclined to look to the historical context which here is a most persuasive indicia tending to validate the manifestation of the legislature's response to this problem.

Mini-Code constituting the balance of the total finance charge allowable under Tit. 5, § 317. We have rejected this construction.

The pre-Mini-Code cases cited by appellant which stand for the proposition that not all charges for the use of money can be properly called interest[2], graphically demonstrate why the legislature sought to statutorily put an end to the ofttimes imponderable queries as to where, as a matter of law, the demarcation between "interest" and additional charges for the use of money fell. For the most part, this troublesome issue had been rendered moot by the inclusive definition of "finance charge" contained in the Mini-Code. We note that in addition to resolving this issue, the Mini-Code has protected the borrower with an absolute litmus of whether he has been charged for the use of money in excess of that amount allowed by law, while at the same time providing prospective statutory flexibility in the light of an unstable money market.

In holding that the legislature intended the "finance charge" provision of the Mini-Code to be the sole indicia of what constitutes the maximum legal amount allowable for the use of money loaned thereunder, we have adhered to the rule set out in American Standard Life Ins. Co. v. State, 226 Ala. 383, 384, 147 So. 168 (1933):

"'In the construction of a particular statute, . . . endeavor should be made, by tracing the history of legislation on the subject, to ascertain the uniform and consistent purpose of the legislature, or to discover how the policy of the legislature with reference to the subject matter has been changed or modified from time to time.' 59 Corpus Juris, 1043; 25 R.C.L. 1063, § 287; Birmingham v. So. Express Co., 164 Ala.

529, 51 So. 159; Doss v. State, 220 Ala. 30, 123 So. 231, 68 A.L.R. 712."

There remains the question of the area of operation of the Usury Law, for if effect can be given consistent with the legislative intent to part of the provisions of an old statute, without violation of the provisions of the new, repeal by implication can be said to be only partial. Levy, Aronson & White v. Jones, 208 Ala. 104, 106, 93 So. 733 (1922).

Certainly, the 6% maximum interest rate where interest is contemplated but not stipulated in written contract, presents no conflict with any of the provisions of the Mini-Code and accordingly no repeal of that provision has occurred.

In holding that the provisions of the Usury Law restricting the maximum legal interest rate is repealed for those credit transactions now regulated by the Mini-Code, we pretermit, for want of standing on the part of appellants, a ruling on their challenge of the statutory definition of "creditor" under Amendment XIV, U. S. Constitution or Art. 13, § 252, Alabama Constitution of 1901. Where a particular litigant is not within the group of persons affected by a statute or portion thereof which is allegedly unconstitutional, such litigant lacks standing to raise such constitutional issue. Marcet v. Board of Plumbers Examination and Registration of Alabama, 249 Ala. 48, 50, 29 So.2d 333 (1947); State ex rel. Highsmith v. Brown Service Funeral Co., 236 Ala. 249, 253–54, 182 So. 18 (1938).

We are therefore of the opinion that the trial court ruled properly in granting judgment for appellee.[3]

The judgment is due to be and hereby is

Affirmed.

2. Darden v. Schuessler, 154 Ala. 372, 45 So. 130 (1907); Commercial Credit Company v. Tarwater, 215 Ala. 123, 110 So. 39 (1926); Pryor v. Associates Discount Corporation, 43 Ala.App. 394, 191 So.2d 234 (1966).

3. The ruling by the circuit court is without prejudice to any members of appellants' alleged class. Neither notice nor an opportunity to be heard was ever afforded such persons. Indeed, the record does not reflect that the

HEFLIN, C. J., and MERRILL, BLOODWORTH, MADDOX, SHORES and EMBRY, JJ., concur.

JONES, J., concurs specially.

FAULKNER, J., dissents.

JONES, Justice (concurring in the result).

I would wholeheartedly join in the dissent of my brother, Mr. Justice Faulkner, if the constitutional issues discussed in his dissent were properly raised and presented for our review. We are limited by the stipulation of facts submitted to the lower court by the parties and the issues raised thereby. Therefore, I concur in the result of the majority opinion to the effect that § 340 allows 8% add on finance charges and the 9% per annum simple interest charged here does not exceed that rate. To be sure, the parties stipulated that the 9% reflected by the mortgage, plus all other charges incident to the loan, fall below the maximum allowable rate prescribed by § 317.

I am constrained to comment on two aspects of the Mini-Code, particularly as it relates to real estate mortgages. While compromise is the hallmark of the legislative process, indirection amounting to outright deception, which permeates this Act, can only serve to breed disrespect for the institutions of government.

First, § 340 "backs" into coverage of real estate mortgages for purposes of the increased finance charges by exempting those "covered" from all *other* provisions of the Act:

"None of the provisions of this chap-- ter, except provisions of subsection (a) of section 316 and section 317 of this title, shall apply to any loan, forbearance, or credit sale involving an interest in real property or the sale, lease or mortgage of an interest in real property, where the creditor is a lending institution which is an approved mortgagee under the provisions of the National Housing Act or is exempt from licensing under this chapter."

The legislative history makes apparent the following sequence of events:

The Mini-Code, absent § 340, was initially defeated by the legislature and lay on the shelf for two years prior to its reintroduction in 1971. The bill was on the verge of suffering its second defeat when the proponents offered to amend the bill by adding § 340 under the pretense of assuring the opponents of the bill that the Act could not be used by real estate mortgagees to exceed 8% per annum interest. By use of the double negative—"None of the provisions . . . except provisions . . . ."—this amendment not only provided the real estate mortgagees with their cake, but allowed them to eat it as well. They were given all of the advantages of the Act—increased maximum finance charges—and were saddled with none of its disadvantages—sanctions, penalties, etc.

Second, while this delusive method of inclusion is a serious and reprehensible flaw, it pales into relative insignificance when compared to the second evil that pervades the entire Act—that of fixing the allowable rate of finance charges at 8% add on. What a shame that the legislature's forthrightness in combining all allowable charges (interest, points, service fees, etc.) into one single finance charge stopped short of a maximum annual percentage rate fixed for such charges. The 8% add on rate authorized by § 317 can only be denominated as misleading and deceptive in and of itself. Admittedly, this is no new

---

circuit court made any ruling as to the maintainability of their suit as a class action required by ARCP 23(c)(1). Failure to so rule generally would necessitate remanding the cause to the trial court for such a deter-mination. However, as we have reviewed this appeal on its merits ruling adversely to the proponent of the class, such a remandment would have served only to protract ultimate resolution of the merits.

innovation (6% add on already existed under prior statutes), but the mellowing process of antiquity could hardly add a whit of purity to so rotten a scheme.

Instead of fixing an annual percentage rate (which incidentally, § 317(b) appears initially to do—"$8 per $100 per year"—the only forthright method of dealing with usury, the Act then alludes to the illusory gimmickry of the commercial community and provided for 8% add on—". . . by computing the maximum rate authorized . . . on the original principal amount of the loan . . . for the full term of the contract without regard to scheduled payments . . ."

Given any typical factual situation involving monthly installments over a period of years, not even the experts can agree on the APR conversion rate. Indeed, it may run as high as 16% under this formula. The cost of borrowing money would equate the same figure whether the loan is repaid in monthly installments or if none of the principal or interest were due or paid until the last day of the mortgage period. Stated otherwise, under the latter hypothesis, the borrower receives no credit whatsoever, insofar as finance charges are concerned, for payments made during the term of the mortgage.

Proponents of "add on" argue that real estate mortgagees would not abuse the law by charging up to the maximum rate allowable, but would instead follow the traditional practice of charging a per annum percentage rate of 8½ to 9½, which is well within the add on method of computation prescribed by the Act. This argument begs the question because, if this be true, there is no need for a usury law in the first instance.

The legislature, in establishing public policy with respect to usury, is proscribing illicit conduct in the field of commercial lending. It can ill afford to be guilty of conduct as reprehensible as that which it proscribes.

I realize that I have been severely critical of this Act, both from the standpoint of the method by which real estate mortgagees were included for purposes of the increased maximum rate of finance charges as well as the add on method of computing the maximum rate allowable. While not apologizing for either aspect of my criticism, let me hasten to say that it is entirely understandable that such things do occur. The myriad and complex items of legislation with which the members of the legislature find themselves continually faced, coupled with the pressure brought to bear by special interest groups, can only cause one to marvel that such matters do not occur with even greater frequency. I conclude on the note that a more adequate professional staff to assist those dedicated to the improvement of our laws is at least a partial answer.

FAULKNER, Justice (dissenting).

As Alice said, "Dear, dear! How queer everything is today! And yesterday things went on just as usual. I wonder if I've changed in the night." [1] I have not changed from my position in State of Alabama, ex rel. William J. Baxley, as Attorney General v. Leonard C. Johnson, Ala., 300 So.2d 106 (1974). I therefore dissent.

This case presents the same issue as was presented in *Baxley*, i. e. whether Act 2052, Acts of Alabama, 1971, Vol. IV, p. 3290 (Mini-code) repealed § 60, Title 9, Code of Alabama 1940. In *Baxley*, subsequently withdrawn as a "sweetheart" suit, it was held there was no repeal by implication. Today, the court holds that § 60 was repealed by implication.

It is my opinion that the Mini-Code does not repeal § 60 of Title 9 by implication.

1. Lewis Carrol, "Alice's Adventure in Wonderland", *The Complete Works of Lewis Carrol*, Modern Library, New York, p. 28.

Repeal of an act by implication is not favored by the courts. Ex parte State, In re State of Alabama v. Franco, Ala., 299 So. 2d 737 (1974); Board of Revenue v. State, 241 Ala. 175, 1 So.2d 904 (1941); Thompson v. Chilton County, 236 Ala. 142, 181 So. 701 (1938). Courts can only learn what the legislature intended by what it has said, and have no right to stray into the maze of conjecture or search for an imaginary purpose in construing the statutes. Alabama Industrial Bank v. State, ex rel. Avinger, 286 Ala. 59, 237 So.2d 108 (1970). The Mini-code provides no glaring or irreconcilable repugnance to § 60 of Title 9. The effect of the decision of this court until this opinion is that for a later statute to repeal an earlier one by implication, the repugnance between the two must be glaring and irreconcilable so that the two statutes cannot stand together. Bates v. State, 240 Ala. 609, 200 So. 779 (1941). Section 60 specifically provides for the *rate of interest* payable on a loan. Section 1(a) of the Mini-code provides for the payment of a *finance charge* which is defined as including "all charges . . . as an incident to the extension of credit, *including interest,* time price differential, points or discounts . . . service, carrying or other charge . . . loan fee, credit or investigation fee . . . ." (Emphasis added.) How could there be any irreconcilable repugnance here? How shall a borrower compute *interest* on his loan when it is included in the above conglomeration of charges? Interest is only one item in the make-up of the *finance charge*. The majority opinion permits a charge of 9% interest in this case. Is this true interest or is it a portion of the finance charge? The majority has permitted *8% add on interest* without taking into consideration the other elements that go to make up the *finance charge*. From the record we do not know if there were any other charges. This goes beyond the statute. This will become a very common thing with money lenders. They will charge *8% add on interest* and as side effects will charge survey fees, credit fees, investigation fees, title examination fees, points, and a host of other charges that the borrower may or may not see on his closing statement. The draftsman of the findings of fact and conclusion of law in *Baxley* very skillfully included all items including *interest* in the *finance charge* in arriving at a maximum. Not so here. The majority concludes that 8% add on interest *plus* the other elements of the finance charge constitute the maximum. If this not be so, why state the finance charge to be the "sole indicia of what constitutes the maximum *legal amount allowable for the use of money loaned."* (Emphasis added.) Interest is a charge for the use of money. The conclusion of the majority is incredible.

In another area of no repugnance between the two statutes it is to be noted in § 1(a) that only *discounts* or *points* are required to be spread over the stated period of the loan. There is no provision for amortization of the interest. So, if interest is added on for a full term of say, 10 years, and the borrower wants to prepay his balance at the end of 5 years, what is his prepayment figure? The real estate borrower does not enjoy the prepayment privileges of receiving a refund of interest under § 3 of the Mini-code because the "bank" lender is exempt from all sections except § 1(a) and § 2.

### The Constitution Issue

The appellant, in brief, argues denial of equal protection of the laws. The argument is skimpy and one wonders why no citations or references were made. Was the appellant sincere in this area? Since the appellant has raised the issue I feel that it should be discussed.

Section 25 of the Mini-code specifically exempts state and national banks, savings and loan associations, credit unions, life insurance companies, and federally constituted agencies from all provisions of the Act

except subsection (a) of § 1, and § 2. Section 18 exempts those organizations from licensing. Therefore, those organizations are exempt from any of the penalty provisions of the Act for usurious charges (§§ 15 and 24) and they are exempt from control of the Superintendent of Banks under § 17. The borrower has no recourse against the lender for overcharges under § 65, Title 9 because that section only applies to penalties for overcharges of *interest* prescribed in "this chapter." Interest, by this majority opinion, has no meaning. We are now dealing with *finance charges*. Since part of *"this chapter"* has now been held to be repealed, § 65 has no application. And, the borrower cannot look to the Act and the Superintendent of Banks for any help against abuse for overcharges, because of the exemption of those lenders.

The exemption of banks and savings and loan associations from licensing and penalties, while at the same time enjoying the privilege of charging "finance charges" as other creditors, is in violation of Article 1, § 22, Constitution of 1901. This constitutional provision states that the legislature shall not pass a law of exclusive or special privileges or immunities. The Mini-code not only grants special privileges to the exempted money lenders, but also grants them immunity for abuse of the law. This is repugnant to our form of government and out of harmony with the genius of our free institutions. Furthermore, by not granting a borrower a remedy for any abuse of the law by the exempted organizations and exacting penalties from other creditors for the same violation, the Mini-code runs afoul of § 6 and § 13, Article 1, Constitution of 1901, by denying equal protection and due process of law. These constitutional provisions distinctly prohibit the type of discrimination allowed the exempt organizations under the Mini-code. Since there is no severability clause in the Mini-code, I would hold the entire Act constitutionally void. I would not pretermit this issue on the flimsy excuse of "want of standing."

The brief of appellant did not argue the violation of § 45, Article 4 of the Constitution. But, the Act clearly violates this constitutional provision. The title of the Act states,

"An Act

"To provide maximum finance charges for loans and credit sales; to regulate extensions of credit, including consumer loans, consumer credit sales and consumer leases; to provide penalties for violations of this Act; and to authorize the Superintendent of Banks to administer this Act."

It clearly omits any reference to a consumer protection council provided for in § 26 of the body of the Act. Section 45, Article 4 of the Constitution provided that "Each law shall contain but one subject, which shall be clearly expressed in its title . . . ." Even though the Act is colloquially called "Mini-code" it is not a "code of laws" and does not fall within the exception of § 45 providing for "bills adopting a code, digest or revision of statutes."

A code implies first a compilation of existing laws, their systematic arrangement into chapters or articles and sections with subheads, table of contents and index for ready reference; second, a revision such as to harmonize conflicts, supply omissions, and generally clarify and make complete the body of laws designed to regulate completely so far as a statute may, the subjects to which they may relate. Gibson v. State, 214 Ala. 38, 106 So. 231 (1925).

Section 45 has two requirements. First, "each law shall contain but one subject;" second, "the subject shall be clearly expressed in its title." This Act does not conform with these constitutional requirements. No liberal construction of the Act will correct this constitutional deficiency. Our cases have said in construing "each law shall contain but one subject" that if the title contains more than one subject and the entire Act refers to one of those

subjects, the other will be treated as surplusage and the Act will be upheld. Hawkins v. Roberts & Son, 122 Ala. 130, 27 So. 327 (1898); Robinson v. Moseley, 93 Ala. 70, 9 So. 372 (1890). That construction cannot be applied here.

The majority opinion indicates that the constitutionality of the Act cannot be considered "for want of standing." I believe that they should not put off deciding the inevitable. One of these days an irate borrower is going to go to the money lender and say, "You have been charging me high interest under an unconstitutional statute." The lender will give him a gracious smile, sit back, and wait for a summons to court. Meanwhile, the usury law becomes "curiouser and curiouser."

### Conclusion

It is my opinion that conventional mortgage loans to individuals on real estate are still subject to the maximum interest rates found in §§ 60 and 61, Title 9, Code of Alabama. The 6% add on rate stated in § 61 will permit a rate of up to 12% on a declining balance. Surely, this should be enough for the "criers" and "whimperers." Experiences in other states of this Union have shown that when interest on real estate loans for a long period exceeds 9% simple interest, loans go begging and foreclosures run rampant. It is an unlearned borrower who will obligate himself to a 30-year loan at an interest rate of 10% or 12%. Interest is the largest single item in the cost of a home. It cannot be passed on by the borrower as it can by the bank, the builder, or the materialman. To a business man, a bank or builder, interest is a commodity—another item in the cost of doing business. The home buyer is stuck with it. We are told by the amicus curiae that Alabama is a borrower state and high interest rates are needed to shore up the economy. They appear to be short-sighted and oblivious to the fact that Alabama's per capita income ranks at the bottom of the list. Before a borrower can pay high interest, he must be given an income commensurate therewith. Increased incomes do not appear on the horizon, because every time a worker or union demands increased wages, the cry of inflation is heard. It is not increased wages—but high interest, the dominant evil of inflation.

No respectable and sound banker will make long-term loans at high interest rates. But, with no fear of penalties under the Mini-code, and no recourse by the borrower against abuse, the sharks will move in. So, how queer it is today, and yesterday was just as usual.

### The Majority Holding

The majority holds:

1. Real estate mortgages fall within the Mini-code on loans of over $2,000 and less than $100,000.

2. The interest on those mortgages can be 8% add on which can amount to 16% simple interest on a declining balance in equal payments, but may be an astronomical rate if the lender decides to demand interest repaid in unequal installments, which is permitted by the Mini-code.

3. The mortgage bankers, banks, savings and loan associations, insurance companies, etc., who are exempt from the Mini-code except those provisions permitting the interest charge, have a free rein without fear of any penalties for overcharge of interest or abuse of the law.

4. As those institutions are not subject to any control by the Superintendent of Banks, nor is there any penalty provisions in the Mini-code relating to them, the consumer borrower is at their mercy and the devil take the hindmost.

I would reverse the trial court.