Kmart Corporation appeals from a judgment entered on a jury verdict in favor of Eugene Peak in Peak's premises-liability action seeking damages for physical injuries. We affirm.
The facts of this case are undisputed. Eugene Peak, then age 64, was injured on December 13, 1995, in the defendant Kmart's store in Cullman, by an automatic *Page 1140 
door. The door had been manufactured by Gyrotech, Inc., and installed by Universal Door Systems, Inc. ("Universal"). The accident occurred as Peak was attempting to enter the store to shop for Christmas gifts. Because he had not fully recovered from a stroke he had suffered the previous summer, he was walking slowly and with the aid of a walking cane. As he approached the building, the outermost set of automatic doors opened and he walked through the doorway. He then encountered a second set of automatic doors, which also opened spontaneously.
However, as he stepped across the threshold of the second doorway, the door suddenly closed upon his left leg and knocked him to the floor; his left hip was fractured in the fall. This incident was witnessed by at least two other Kmart shoppers, namely, Mrs. Dorothy Welch Horton and her daughter. They rushed to the side of Peak, who was lying across the threshold of the doorway. When they reached him, the automatic door was still closing on him, squeezing him in the doorway. As Horton attempted to extract Peak from the doorway, she was forced to use her body as a wedge against the door, which, by that time, was closing on both her and Peak. Ultimately, a Kmart employee arrived on the scene and disconnected the door's power supply. Peak was then taken in an ambulance to a hospital, where he underwent hip surgery.
On December 20, 1995, pursuant to a service contract between Universal and Kmart, Universal sent service technician Rodney Preston to the scene to investigate the cause of the incident. Preston found that the "the holding beams," that is, automatic sensors located in the doorway, "were inoperative." This was so, he concluded, because a "wiring harness" had become disconnected, so that the power supply to the holding beams was disrupted.
Peak sued Kmart, alleging that it had negligently or wantonly "allowed [the] door to exist in a dangerous and hazardous condition and without proper and necessary safety measures to prevent foreseeable falls such as the one made the basis of this suit." He also sued Universal, and Kmart cross-claimed against that defendant.
The case proceeded to trial. The court directed verdicts for Universal both as to Peak's complaint and as to Kmart's cross-claim. Peak's negligence and wantonness claims against Kmart were submitted to the jury, which awarded Peak $100,000 in compensatory damages and $225,000 in punitive damages. The court entered a judgment on that verdict. After the court denied its posttrial motions, Kmart appealed. Kmart's appeal relates only to the judgment on the jury verdict; Kmart makes no argument regarding its cross-claim against Universal.
Kmart challenges (1) the trial court's admission of evidence of other incidents involving the malfunction of automatic doors at the same Kmart store; (2) the sufficiency of the evidence of liability; (3) the trial court's refusal to give certain requested jury instructions; and (4) the amount and the propriety of the punitive-damages award.
 I. Evidence of Other Incidents
Kmart complains of the admission of evidence involving two other incidents. Those incidents involved customers named Dixie Maze and Mary Roberts, and in each of those incidents an automatic door at this Kmart store closed upon the customer. The Maze incident, the Roberts incident, and this plaintiff's incident involved three separate doors; however, those three doors were identical in all relevant respects. The trial court admitted evidence of these other two incidents over the objections of Kmart.
The general rule is that "[i]n an action for injury, allegedly caused by the defendant's negligently keeping or maintaining a dangerous place or instrumentality, evidence of notice to the defendant, prior to the accident in suit, of the alleged *Page 1141 
dangerousness or defectiveness is material or consequential in a negligence action." Charles W. Gamble, McElroy's Alabama Evidence
§ 64.04(1), at 290 (6th ed. 1996) (emphasis added). Consequently, in a negligence action, "the plaintiff may prove the occurrence of other accidents at such place or with such instrumentality if relevant to show notice or knowledge of such defect or danger." Id. "It is clear, however, that Alabama courts historically have concluded that [evidence of other accidents is not relevant] unless there is a substantial similarity between the facts existing at the time of the offered accidents and those prevailing at the time of the incident being litigated." Id. See also Wyatt v. Otis Elevator Co., 921 F.2d 1224 (11th Cir. 1991).
 A. The Maze Incident
On November 15, 1994, that is, approximately 13 months before the Peak accident, an automatic door closed on Maze, injuring her arm. After that incident, Kmart generated an internal accident report, but it did notreport the incident to Universal or request an investigation as to thecause. The internal report quoted Maze as saying that she had "been down in her back and couldn't move fast enough to get clear of the door."
Kmart acknowledges the general rule regarding the admissibility of "notice" evidence, but contends that "there is absolutely no proof of any defect or any failure to inspect the door with regard to the Maze incident."Brief of Appellant, at 48.
This argument is unpersuasive, however, in view of the fact that Kmartdid not attempt to determine the cause of that incident. Indeed, the fact that Kmart essentially ignored the Maze incident does not negate the notice imputed to it by the incident. On the contrary, the Maze incident, at the least, should have placed Kmart on notice that it should inquire as to whether its doors were imperiling customers. The fact that it took no specific remedial action after the Maze incident does not aid Kmart's position.
Moreover, the Maze incident and the Peak incident were similar in that, while they did not involve the same door, the doors involved were identical in all material respects and in that both Maze and Peak were injured because they could not move quickly enough to avoid being hit by the door. At trial, Kmart acknowledged that its customers included persons who might be laboring under various physical infirmities, such as those Maze and Peak had. For these reasons, the evidence regarding the Maze incident was admissible.
 B. The Roberts Incident
In July 1996, that is, approximately seven months after the Peak accident, an automatic door closed on Mary Roberts. Because the Roberts incident postdated Peak's accident, evidence of the Roberts incident is, of course, not admissible under the general rule regarding "notice" evidence. Specifically, "[t]his Court has held that evidence of subsequent
accidents and injuries is not admissible to prove that a defendant knew of the dangerous condition at the time of the accident that is the basis for the lawsuit." Burlington N.R.R. Co. v. Whitt, 575 So.2d 1011 (Ala. 1990) (emphasis added), cert. denied, 499 U.S. 948 (1991); Hyde v. Wages,454 So.2d 926 (Ala. 1984). Indeed, the trial court granted Kmart's motionin limine to exclude evidence of the Roberts incident; it was ultimately admitted, however, on the ground that Kmart itself had "opened the door" to the evidence.
The evidence was sharply disputed as to whether, or to what extent, Kmart was monitoring the functioning of its automatic doors. The answer turned on whether Kmart employees were conducting daily inspections, and, if so, whether they were conducting them in compliance with Universal's recommendations. In that connection, at the time of Peak's accident the automatic doors at this Kmart store had affixed to them a decal, affixed by Universal, *Page 1142 
that contained the following directions: "1. CHECK DAILY FOR PROPER OPERATION INCLUDING ALL HOLDING MATS, SENSORS, HOLDING BEAMS, DECALS AND OPERATING SPEED. 2. DISCONTINUE DOOR OPERATION IMMEDIATELY UPONMALFUNCTION. 3. NOTIFY SERVICE AGENCY FOR REPAIR. 4. CONSULT YOUR OWNERSMANUAL FOR PROPER SAFETY PROCEDURES. IF YOU NEED A COPY CALL (OR WRITE)." (Emphasis added.)
On December 20, 1995, when Universal's service technician Preston wrote his postaccident inspection report, he stated:
 "Upon arrival, all doors were turned on, in operation, and being used despite our office having requested that the Right Side Interior door be turned off and left open until we could inspect it. Upon inspection, I found the holding beam harness connector (located in the top of the swing panel) to be disconnected with both harness and connector taped in place. I found that all operating speeds, checking speeds, and time delays were in accordance with current ANSI standards. I have conversed with my office about these findings and photos have been taken of these doors. On the Right Side Exterior door, I replaced the interior motion detector. I have checked all doors for safety operation with directional and safety decals and daily check lists. Daily check lists are not being utilized by store management. If so, both Right Side doors would have been turned off when I arrived. Also, were daily inspections being performed (as directed by the daily check list decals on each door) the inoperation of the Right Side interior doorway holding beams would have been detected and could have possibly prevented an accident. I have reviewed the repairs with/Questioned the store Mgr — OK."
(Emphasis added.)
During the trial, Kmart presented the testimony of Shirley Sheridan, a "hard-lines manager" at the Kmart store. She testified that after Peak's accident Universal supplemented the existing decals with others containing different or expanded instructions as to the proper method of performing the daily inspections. The record contains the following colloquy:
 "Q. [By Kmart's counsel] And let me ask you this: Since Mr. Peak's fall there has been another decal put on that door, hasn't there?
"A. [By Sheridan] Yes, sir.
 "Q. That one over there we just looked at, the little silver one, that's in general terms, it's still on there, isn't it?
"A. Yes, sir.
 "Q. Now, this new decal, it's a little bit longer than that one, isn't it, it's got a piece of blue and all of that on it, is that right?
"A. Yes.
 "Q. Let me show you an exhibit that's marked as `Defendant's Exhibit Number 1' for us. If you could, take a look at that and I anticipate offering it into evidence so the jury can see it. Does that look like the decal that was put on there by someone after Mr. Peak's incident?
"A. Yes, sir, it is.
 "Q. And that decal — you know, I think it speaks for itself — but does it tell you anything about what you do when you stand in the threshold of an automatic door?
"A. What to do while you're standing in it?
"Q. Yes.
"A. Yeah.
"Q. What does it say?
 "A. Says to stand there up to four seconds to make sure the door doesn't close.
 "Q. And had you ever heard anybody tell you or have you ever seen any decals on the door out there before Mr. Peak's fall that said stand in *Page 1143 
the threshold like this one does, stand motionless in the threshold for at least four seconds, the door should not close.
"A. No, sir.
 "Q. Had you seen anything, any decal like that before Mr. Peak's fall?
"A. No, sir.
 "Q. And this particular decal right here or one just like it, is it on the same door now that Mr. Peak had his fall on?
"A. Yes, sir.
"Q. It is on all of those doors now, isn't it?
"A. Yes."
(Reporter's Transcript, at 226-28.)
Later, Peak's attorney stated to the court:
 "I would like to raise the court's attention to the fact that the service orders from Universal Door [showing the Roberts accident] which were created after Mr. Peak's injury are now relevant in my opinion. The reason they are relevant is that Kmart has [chosen] to introduce into evidence and talk to a witness about the subsequent checklist, what I call the new checklist, that was put on after Mr. Peak's incident. They questioned at length Ms. Sheridan with regard to the fact that she didn't have enough information in which to do the safety checks adequately. They went into great length about all of the other information that is on this new checklist that was not on the old checklist. . . .
 "The service orders after this incident clearly show once again that Kmart was not even taking the most basic steps when there was a problem with the door, that is, to turn it off. Everybody recognizes that is . . . common sense, the most basic rule with handling these doors [is] if there is a problem, turn them off. They say that occurred because they didn't have enough information. They got new information with the new checklist, and if they had had that to start with everything would have been different. I'm entitled to show their actions even after they got the checklist, with the court being mindful they brought this issue up, not the plaintiff."
When Kmart reiterated its objections to evidence of Roberts's accident, the trial court responded: "It was put on the door by Universal Door is the testimony but you're the one that brought it in, started questioning on it. As far as I'm concerned, you've opened the door and it is wide open and they're going to go trotting right through it."
Kmart says it introduced the "different check list" to show that "there was another method of checking the doors requiring a person to remain still during the inspection so that no false reading would be obtained[1]
and to further show that Kmart had not been informed of this better way prior to the Peak incident." Brief of Appellant, at 49. The implication is, of course, that if Universal had informed Kmart of this "better way" to conduct its daily inspections, then Mr. Peak's accident would have been prevented. The Roberts evidence suggested that Kmart's mere knowledge of the "better way" would not have prevented Peak's accident. *Page 1144 
Peak's position regarding the checklist paralleled that of Universal: that Kmart was neither performing daily inspections nor deactivating doors when a malfunction was discovered. It could also suggest that none of the information provided by Universal sufficiently apprised K-Mart of the proper method of inspection. Indeed, that suggestion was mirrored in arguments made by Kmart as to its cross-claim against Universal.
Evidence of the more complete checklist, and, consequently, of the Roberts incident, was introduced during the presentation of Peak's case-in-chief, that is, while Kmart still had a viable cross-claim against Universal. Thus, its introduction appears to have been a calculated trial tactic. But Kmart could not have the benefit of evidence of the "better way" without the appurtenant burden of evidence tending to rebut its implications. For these reasons, the trial court did not err in allowing evidence of incidents postdating Peak's accident.
 II. Sufficiency of Evidence of Wantonness
Because Peak was a business invitee at the time of the accident, Kmart owed him "a duty to exercise reasonable care to maintain its premises in a reasonably safe condition." Norris v. Wal-Mart Stores, Inc., 628 So.2d 475,477 (Ala. 1993). The malfunctioning door in this case was a part of the premises itself. This Court has said:
 "[W]here the alleged defect is a part of the premises . . ., the question whether the defendant had actual or constructive notice of the defect will go to the jury, regardless of whether the plaintiff makes a prima facie showing that the defendant had or should have had notice of the defect at the time of the accident."
Mims v. Jack's Restaurant, 565 So.2d 609, 610 (Ala. 1990).
However, to establish wantonness, the plaintiff must "prove that the defendant caused harm by the conscious doing of some act or the consciousomission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury would likely or probably result." Alfa Mutual Ins. Co. v. Roush, 723 So.2d 1250, 1258
(Ala. 1998) (Cook, J., concurring specially) (emphasis added). The specific duty in this case was the duty to inspect the automatic doors on a daily basis, and it is the alleged breach of that duty that caused Peak's injury. Whether, and with what effect, Kmart was performing this duty was a matter of sharp dispute at trial. Kmart contended that it was routinely inspecting the doors, but Universal contended that it could not have been doing so, or at least, that it made no inspection on the day of Peak's accident. If it had, Preston concluded, the inspector would have discovered that the holding beams were inoperative and Kmart would not have had the door activated and in operation when Peak arrived.
In this connection, Kmart argues that Peak failed to prove that the disconnection in the wiring, which Preston discovered during his December 20, 1995, service call, actually existed on December 13, 1995, and that that was the condition that caused the accident. Whether the door that injured Peak was activated and operating in its defective condition, as Universal insisted it was, a week after the accident was another factual matter the jury had to resolve. The essence of Kmart's argument is that if the door was operating when Preston arrived, then Peak cannot show that the wiring problem did not develop between the time of the accident and the time of Preston's inspection.
However, Kmart cannot rely on its own malfeasance to avoid liability for malfeasance. The instructions on the door decals required that malfunctioning doors be deactivated until they could be inspected and serviced by Universal. Kmart cannot rely on its failure to follow that instruction as means to raise an issue regarding causation. In other words, Kmart could not operate the door for a week before the *Page 1145 
investigation and then argue that the cause of the accident could not be determined because the door had been activated and operating for a week.
It is undisputed that Maze was injured in an incident similar in all relevant respects to the one involved in this case. It is further undisputed that, after the Maze incident, Kmart did not deactivate the door or attempt specifically to determine the reason for Maze's injury. In other words, Kmart summarily continued to operate a door that had proven hazardous to its customers. The jury could have considered that fact in conjunction with the disputed testimony and reasonably could have concluded that, indeed, Kmart was not inspecting its doors or taking any precautions to prevent injury to its customers from a known hazard.
The trial judge stated his own construction of the evidence of wantonness, as follows:
 "[The] factors that I see that shock the conscience of this court with regard to that is obviously when they put these doors into any store they have put in something that is capable of causing injury. That should be evident to them, if they didn't know it they should have known it because there were warning signs all over the doors. One of the warning signs on the door is a checklist. It says: "[C]heck this door daily." There is no evidence that Kmart from its corporate headquarters ever presented one iota of instructions to the local employees here as to how to perform the check, what their policy should be on performing that check and there is no evidence
in this case, not even one iota that even after they perform it and they find a problem and they cut the door off that they are able to communicate that. No checklist, no nothing. The next man that comes in, I assume, from what I have seen in this case, sees the door cut off and they just go back over there and cut it back on.
 "There [has been] no policy or procedure . . . established by Kmart to ensure [Universal's] checklist is followed, that inspections are done appropriately, no training provided to the employees from the evidence that was presented by the testimony in this case from Kmart headquarters. That is what shocks the conscience of this court and that is what cause[d] me to let the wantonness claim go to the jury. [Kmart] exhibited an extreme indifference to the consequences of [its] actions."
(Reporter's Transcript, at 553-55.) (Emphasis added.)
The trial court's construction of the evidence is fully supported by the record. In short, there was substantial evidence of wantonness and clear and convincing evidence that Kmart acted with "a reckless or conscious disregard of the rights or safety of others." Ala. Code 1975, §6-11-20(b)(3). Thus, the evidence supported an award of punitive damages. Ala. Code 1975, § 6-11-20.
As to the other issues raised by Kmart, we have reviewed the record and find no error in the rulings or in the judgment of the trial court. That judgment is, therefore, affirmed.
AFFIRMED.
Hooper, C.J., and Maddox, Houston, See, Lyons, Brown, and Johnstone, JJ., concur.
[1] The danger of a "false reading" involves the difference between the "motion sensors" mounted at the tops of the doors and the "holding beams" located within the doorways. The evidence showed that the doors are designed to open when the motion sensors detect movement, but are designed to be kept open by the blocking of the holding beams, which are laterally directed from one side of the doorway to the other, by an object standing inside thedoorway. If the inspector, while standing inside the doorway to block the holding beams, moved sufficiently to activate the motionsensors, the door would not close, regardless of whether the holding beams were functional. Thus, the evidence clearly demonstrated that had the holding beams been operational, the door would not have closed upon Peak.