892 So.2d 299 (2003)
SHIV-RAM, INC., d/b/a Ramada Inn of Anniston
v.
Linda McCALEB.
1012112.
Supreme Court of Alabama.
December 30, 2003.
Order Overruling Rehearing April 2, 2004.
*303 Joe L. Leak and Robert G. Boliek, Jr., and James W. Moss of Friedman, Leak & Bloom, P.C., Birmingham, for appellant.
Kenneth W. Hooks of Pittman, Hooks, Dutton, Kirby & Hellums, P.C., Birmingham, for appellee.
H. Hampton Boles, Ed R. Haden, and Eric B. Langley of Balch & Bingham, LLP, Birmingham, for amici curiae Business Council of Alabama, Alabama Bankers Association, Alabama Civil Justice Reform Committee, and Automobile Dealers Association of Alabama, Inc., in support of the appellant's application for rehearing.
HARWOOD, Justice.
On September 14, 1998, Linda McCaleb ("Linda") and her husband, Dennis, sued Shiv-Ram, Inc., d/b/a Ramada Inn of Anniston ("Shiv-Ram"), and other named and fictitiously named defendants not parties to this appeal. Their complaint alleged negligence, wantonness, breach of contract, and loss of consortium and sought both compensatory and punitive damages. The case was tried before a jury in the Calhoun Circuit Court. At the close of the evidence, Shiv-Ram moved for a judgment as a matter of law, which the trial court denied as to all claims except Linda's breach-of-contract claim. The jury returned a verdict in favor of Linda, awarding compensatory damages of *304 $176,572.82 and punitive damages of $500,000.00. The jury returned a verdict in favor of Shiv-Ram as to Dennis's loss-of-consortium claim.[1] The trial court entered a judgment on the verdict and Shiv-Ram filed postjudgment motions pursuant to Rules 50 and 59, Ala.R.Civ.P., seeking a judgment as a matter of law, a new trial, or a remittitur of the damages. After a hearing on those motions, the trial court entered an order denying Shiv-Ram's postjudgment motions and providing an extensive and thorough analysis of the applicable law; Shiv-Ram appealed. We affirmed.

Facts
The record shows the following. On June 14, 1997, Linda, accompanied by two children, checked into a Ramada Inn motel ("the motel") located in Anniston. Linda had reserved a room with a king-sized bed. After getting settled in the room, Linda began to iron some clothes. Because there was no ironing board in the room, Linda was using the bed as an ironing board. While she was ironing, Linda took a step by the side of the bed to approach the nightstand adjacent to the bed. When she did so, her right ankle "struck something," causing a "very sharp pain." Linda examined her ankle; it had a "goose egg" on it and there was a "speck" of blood. After composing herself, Linda lifted the bedspread and saw what she described as a "sharp thing sticking out" from the bed frame; it was approximately three inches in length. The object was part of the frame that supported the mattress and box springs. Linda then went to the front office of the motel and reported her injury to the clerk on duty.
Although Linda presented a great deal of evidence at trial concerning the severe medical problems and damage she suffered as a result of her injury, involving 99 visits to 14 different doctors, we need not recount any of that evidence because Shiv-Ram states in its initial brief that it "elects not to challenge the jury's very substantial award of compensatory damages to Ms. McCaleb," choosing to challenge only the punitive-damages award.
On February 25, 1997, before Linda's injury, Danny Patel, as the successful bidder at the auction where the motel was sold, entered into an agreement with Anniston Motel Associates, Inc. (hereinafter referred to as "AMA"), the then owner of the motel, to purchase the motel in an "as-is, where is" condition. The transaction was to close on June 13, 1997. In the interim, Danny incorporated Shiv-Ram, which would own and operate the motel. Two days before the closing, Jay Patel, who is not related to Danny but who is a minority shareholder in Shiv-Ram, was told that he would be the general manager of the motel. Jay had been in the motel business for seven years and had been the general manager of a motel in Talledaga for three and a half years. Jay testified at trial that the responsibilities of a general manager included maintenance services and guest safety. He also testified that it was customary in the motel industry to routinely inspect guest rooms for safety and to maintain incident reports and work-order books to keep abreast of any injuries or safety-related problems occurring at the motel. He acknowledged that he was aware that while the motel had been "on the auction block" for some time preceding the execution of the February 25 purchase agreement and during the almost four months between that date and the June 13 *305 closing, the condition of the motel had been allowed to "deteriorate greatly."
The purchase agreement granted Shiv-Ram the right to inspect each room in the motel during the four months preceding the closing, but Shiv-Ram made no effort to do so. Jay testified that he knew that the purchase agreement stipulated that Shiv-Ram was purchasing the property "as-is, where is," and he agreed that, accordingly, if the motel was "full of unsafe beds, that's the way you're buying it." Jay acknowledged that the purchase agreement declared that the seller made no warranties as to the "merchantability, suitability, or fitness for any particular use" of the motel; that Shiv-Ram had been given a sufficient opportunity to inspect the property and was relying solely on its own inspections and examinations of the property and its "own determination of the condition of the property"; and that the purchase agreement gave Shiv-Ram the right to inspect the property and to conduct its own engineering studies and reports, but that between February 25 and June 13 Shiv-Ram had conducted no such inspections or examinations. Jay explained that Shiv-Ram wanted a "seamless transition" in the ongoing operation of the motel, and did not want to shut down operations to conduct inspections and to make repairs.
The "Ramada Standards of Operation and Design Manual," which imposed requirements on franchisees of Ramada Franchise Systems, Inc. ("Ramada"), such as Shiv-Ram, a copy of which was available at the motel, required all room furnishings to be "in excellent physical condition." Jay acknowledged that a bed in the condition of the bed in Linda's room, as depicted by a photograph shown to him at trial, "[w]ould be hazardous" and "dangerous." He was aware that a guest in a room at the motel would "have to negotiate around the bed ... to get about the room [and] to get to either nightstand" and that "it was forseeable ... or it's obvious people would be walking around the bed in close proximity to the bed." He agreed that with a bedspread covering a projecting piece of the metal bed frame, the frame "could be" dangerous. He knew after the fact that there had been "a piece sticking out of the middle of [Linda's] bed." Had he inspected any of the records kept by the previous owners of the motel, he would have learned that those records clearly indicated a recurring problem with bed frames.
Under the purchase agreement, Shiv-Ram had access to all of the records maintained by AMA, including incident reports, which listed incidents or injuries that had taken place on the premises of the motel, and work orders that listed repairs that had been, or that needed to be, made. Jay stated at trial that there were boxes containing "hundreds" of documents to which Shiv-Ram had access and that, although he had had the opportunity to inspect those documents, he never did. Included in those documents were four incident reports made by AMA as a result of other patrons' of the motel striking their ankles on pieces of metal protruding from king-sized bed frames. Jay acknowledged that no incident report or work order was filed detailing Linda's injury and that no photographs were taken of the bed on which she was injured even though such measures should have been taken.
A month before the closing a Ramada representative conducted an inspection of the motel and provided Shiv-Ram with a punch list of what needed to be done to bring the motel within Ramada's standards. In the process, the Ramada representative inspected 18 of the 98 rooms in the motel, but not the one Linda subsequently rented. In his resulting report, *306 the Ramada representative enumerated many items that needed to be repaired, replaced, or refurbished, including some items in the inspected guest rooms. The punch list required Shiv-Ram to make the stated improvements no later that February 1, 1998. Some of the rooms inspected contained king-sized beds, but the report contained no reference to any problems with the bed frames in those rooms.
The record further shows that employees of AMA had full knowledge of the conditions of the bed frames and of various complaints that had been made regarding them. Monica Smith, who had been a "desk manager" at the motel when it was owned by AMA, was retained by Shiv-Ram as the acting general manager when the purchase agreement was entered into and the general manager quit. She testified that even before she became acting general manager, the motel had been allowed to deteriorate and that thereafter there were cutbacks in housekeeping and maintenance, resulting in the further deterioration of the premises. According to her, the maintenance person would sit in the maintenance room all day because he had no supplies or materials to work with. Smith further testified that there were chronic problems in the motel with beds being "off the track and off their frames, and of metal protruding, these rails protruding from the beds"; that the employees of AMA, including the housekeeping staff, had conversations about those problems; that she had seen the file reflecting several injuries caused by the bed frames and numerous work orders relating to the bed frames; that she had written one of the reports concerning a guest who had walked by a bed and had injured his ankle on metal protruding from the bed; and that metal sticking out from the frames of the beds was a common problem. Smith also agreed, when her attention was called to a photograph purporting to depict the condition of the rail on the king-sized box spring in Linda's room on June 14, 1997, and showing a piece of metal protruding from the frame, that such a condition was dangerous. She stated on cross-examination by Shiv-Ram that while she was "aware of the frames and the condition they were in," she was aware of only one accident involving a guest and a bed frame. She stated that no one from Shiv-Ram ever attempted to speak with her before Linda's accident concerning the condition, or safety, of any feature of the motel or ever asked to inspect any records, which she said were readily available in her office.
Jarvis Bailey, who for three years had served as the assistant maintenance person while AMA owned the motel and then as the only maintenance person on the premises, was retained by Shiv-Ram but worked for it only approximately two weeks. He testified that the motel was "already downhill" and in "bad condition when [he] started" with AMA and that the only improvements ever made were "cosmetic stuff." "Plenty of times" he would "just sit in the maintenance room with nothing to do" because he had "nothing to work with. You can only do so much or fix so many things. Some things couldn't be fixed." Concerning the bed frames on the king-sized beds, he explained that they all had inherent structural defects in that the support rails on which the box springs sat were about five inches longer than the box springs and most rails had either no retaining brackets or defective brackets and "the rails would stick out beyond the mattress and box springs." Bailey testified that motel housekeepers struck their ankles on the protruding bed rails "daily," "every day," but guests were injured by the rails only "on occasion." Bailey stated that, in particular, the "trucking school" in Oxford, Alabama, had a contract with the *307 motel pursuant to which truck drivers stayed at the motel and they would complain that "they bumped into the beds, about the railing sticking out," but that "[y]ou couldn't fix them" and "[t]hey need to be replaced." He requested authorization from AMA to replace the beds, but it never authorized him to get different bed frames. Bailey stated that neither Jay nor other Shiv-Ram principals contacted him before Linda's injury on June 14, 1997. Jay, for his part, did not even know that Bailey had been employed by Shiv-Ram and believed that AMA "didn't have a maintenance [person]." He conceded that operating a motel without a maintenance person suggested that there was no preventive maintenance plan in place. He acknowledged that he had never spoken with Smith before the closing on June 13 and that, in fact, "someone" at Shiv-Ram had instructed their personnel not to talk to any AMA employees.
At a hearing conducted on Shiv-Ram's postjudgment motions, Linda called as a witness Ray Patel, apparently not related to Danny or Jay, who purchased the motel from Shiv-Ram on January 16, 2000. Ray testified that after he purchased the motel he received complaints from employees and guests regarding bed frames extending beyond the mattresses they supported. He testified that approximately 8 or 9 of the 98 rooms had bed frames with sharp pieces of metal extending beyond the mattress and that most of the bed rails did not have end brackets. He further testified that upon being notified of the problem he attempted to correct it by covering the protruding rails with plastic, rags, towels, or foam rubber. Clearly, the trial judge was entitled to infer that the problems with the bed frames had not been seriously addressed during the two and one-half years Shiv-Ram had owned and operated the motel following Linda's injury.
In its order denying Shiv-Ram's postjudgment motions, the trial judge found that Shiv-Ram was not entitled to a judgment as a matter of law on either the negligence claim or the wantonness claim, that there was clear and convincing evidence to warrant the jury's award of punitive damages to Linda on her wantonness claim, that because the jury's verdict was supported by the evidence, Shiv-Ram was not entitled to a new trial, and that Shiv-Ram was not entitled to a remittitur of the punitive-damages award because the award was not excessive under the guideposts set out by the United States Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and the factors set out by this Court in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). In the parts pertinent to the issues on this appeal, the order stated:
"On June 14, 1997, the Ramada Inn of Anniston, Alabama, was owned and operated by Shiv-Ram, Inc. The former owner of the motel was Anniston Motel Associates, Inc. The actual change in ownership and operation took place on June 13, 1997.
"During the time that Anniston Motel Associates owned the hotel, the premises had fallen into a state of disrepair. Several cutbacks were made on staff, housekeeping and maintenance equipment. There were few employees left when the ownership changed hands on June 13, 1997. One employee, Monica Smith, stayed on to work for Shiv-Ram after the change of ownership. Monica Smith was in management. Smith did her best to manage the hotel with the materials and manpower she had, but the cutbacks initiated by Anniston Motel Associates made her job difficult.
"Prior to becoming an employee of Shiv-Ram, Smith was aware of a problem *308 with metal bed frames protruding from the motel beds. Members of the housekeeping and maintenance staff told Smith about the problem after they, similar to Mrs. McCaleb, hit their ankles while walking alongside the beds. Smith was also aware of former motel guests who had been injured by the protruding metal in a manner exactly the same as Mrs. McCaleb. Some of the injured guests required emergency medical attention. Some of these incidents were documented on motel incident reports kept on file and on the premises.
"Monica Smith never met anyone affiliated with Shiv-Ram before the change of ownership and operation took place on June 13, 1997. She was never contacted, interviewed nor questioned about any hazards, dangers, concerns or safety related problems existing on the premises. Had she been asked, Smith would have disclosed the problems with the motel beds to the new owners. Similarly, Shiv-Ram never requested an inspection of the property or the motel records and incident reports kept on the premises. Had she been asked, she would have allowed an inspection and assisted in any way.
"Another employee, Jarvis Bailey, also stayed on to work for Shiv-Ram after the change of ownership. Bailey was the maintenance supervisor of the motel while it was owned by Anniston Motel Associates, and worked in this capacity for three years without missing a day. Bailey was aware of a problem with metal bed frames protruding from the beds. Specifically, the king-size beds. It was a daily problem. Quite often, he was approached by housekeepers, members of management and/or motel guests and asked to repair and/or align the bed frames. In Bailey's opinion, the protruding metal bed frames were dangerous. Bailey estimates that only 10% of the bed rails had brackets on each end, that 20% had only one bracket per railing and the remaining 70% had no brackets whatsoever, leaving several inches of sharp, exposed metal hidden under the bedspread. Bailey did his best to repair the frames, but they were unfixable. He constantly informed management that the frames needed to be replaced. His request was never honored.
"Like Monica Smith, Bailey never met anyone affiliated with Shiv-Ram before the change of ownership and operation took place on June 13, 1997. He was never contacted, interviewed nor questioned about any hazards, dangers, concerns or safety related problems existing on the premises. Had he been asked, Bailey would have told Shiv-Ram that all bed frames needed to be replaced because they were old, worn out, dangerous and causing injury to the staff and guests. Similarly, Shiv-Ram never requested Bailey to assist with an inspection of the property to point out any known deficiencies. Had he been asked, he would have allowed an inspection and assisted in any way.
"Beginning in February 1997, Shiv-Ram began negotiations for the purchase of the motel. Shiv-Ram knew that the premises had fallen into disrepair. Nevertheless, representatives of Shiv-Ram knowingly signed closing documents indicating that they were purchasing the property in an `as-is, where is' condition with no warranties as to the merchantability, suitability or fitness of any particular use. Further, by signing the closing documents, Shiv-Ram affirmed that [it] had been given a sufficient opportunity to inspect the property, and [was] relying solely on [its] own investigation and inspection.

*309 "Jay Patel was the Shiv-Ram representative appointed to oversee the change of ownership and eventually manage the motel once the transaction was complete. Jay Patel grew up in the motel industry, and knew that it was his responsibility as a motel manager to address the needs and/or requirements of housekeeping, maintenance and guest safety. He also knew that guest rooms should be routinely inspected, and that such an inspection should include the bed and bed frames. Further, Patel knew the exact date when the change in ownership and operation would take place, and when Shiv-Ram would be responsible for the day to day operations. Like other Shiv-Ram representatives, Patel also knew that the motel had fallen into disrepair.
"On June 13, 1997, Shiv-Ram opened the Ramada Inn of Anniston for business and began renting rooms to patrons. All the while, Shiv-Ram knew that there had been no inspection of the motel property during the months leading up to the change of ownership and operation. On June 14, 1997, the day of Mrs. McCaleb's injury, Jay Patel had `no earthly idea what condition the rooms were in' because he had `never laid eyes' on any of the individual rooms. Linda McCaleb was sent into a trap.
"Jay Patel, as a representative of Shiv-Ram, had the right and opportunity to inspect the premises for dangerous and/or defective conditions before opening for business. He chose not to conduct an inspection. Jay Patel, as a representative of Shiv-Ram, had the right and opportunity to inspect the business records and prior incident reports of the motel in an effort to discover dangerous and/or defective conditions before opening for business. He chose not to conduct an inspection. Jay Patel, as a representative of Shiv-Ram, had the right and opportunity to contact, interview and/or question current and future employees of the motel to discover dangerous and/or defective conditions before opening for business. He chose not to ask. Shiv-Ram did absolutely nothing to insure safety of motel guests before opening for business on June 13, 1997, and can offer no explanation as to why.
"Yet, Shiv-Ram assigned Linda McCaleb to a room that had not been inspected for a known, possible and/or potential safety hazard. Shiv-Ram did not take the steps required to determine if this room, especially the bed frame in the room, was reasonably safe for occupancy. Shiv-Ram exhibited no concern for Linda McCaleb's safety. Shiv-Ram simply continued with business as usual despite the fact that its employees had an awareness of previous patron injury from being `cut' when striking a protruding metal bed frames."

Issues Presented on Appeal
On appeal, Shiv-Ram argues (1) that this Court should overrule our earlier decision in Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993), which held that the $250,000 cap on punitive damages established by the Legislature was unconstitutional, and should then limit the punitive damages in this case to the amount set by that cap; (2) that the trial court erred in holding that there was clear and convincing evidence of wanton conduct as required by Ala.Code 1975, § 6-11-20 for an award of punitive damages; and (3) that the punitive-damages award was excessive and violated the constitutional standards set out by the United States Supreme Court in BMW of North America, Inc. v. Gore, supra, and by this Court in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil, supra.

*310 I. Applicability of Henderson v. Alabama Power Co.

At the time Henderson was decided, § 6-11-21 provided:
"An award of punitive damages shall not exceed $250,000, unless it is based upon one or more of the following:
"(1) A pattern or practice of intentional wrongful conduct, even though the damage or injury was inflicted only on the plaintiff; or
"(2) Conduct involving actual malice other than fraud or bad faith not a part of a pattern or practice; or
"(3) Libel, slander, or defamation."
Justices Maddox, Houston, and Steagall dissented in Henderson, and the soundness of the holding in that case has continued to be questioned by other Justices. See, e.g., Ex parte Apicella, 809 So.2d 865 (Ala.2001); Oliver v. Towns, 770 So.2d 1059 (Ala.2000); Goodyear Tire & Rubber Co. v. Vinson, 749 So.2d 393 (Ala.1999) (Houston, See, Lyons, and Brown, JJ., concurring specially); and Tuders v. Kell, 739 So.2d 1069 (Ala.1999). Linda argues that as a consequence of the Legislature's enactment of Act No. 99-358, Ala. Acts 1999, and Act No. 2001-344, Ala. Acts 2001, the version of § 6-11-21 in effect at the time Henderson was decided (hereinafter "former § 6-11-21") was repealed by implication and therefore cannot be revived. Act No. 99-358 comprehensively amended former § 6-11-21. Section 1 of Act No. 99-358 reads as follows:
"Section 1. Section 6-11-21, Code of Alabama 1975, is amended to read as follows:
"§ 6-11-21.
"(a) Except as provided in subsections (b), (d), and (j) in all civil actions where an entitlement to punitive damages shall have been established under applicable laws, no award of punitive damages shall exceed three times the compensatory damages of the party claiming punitive damages or five hundred thousand dollars ($500,000), whichever is greater.
"(b) Except as provided in subsection (d) and (j), in all civil actions, where entitlement to punitive damages shall have been established under applicable law against a defendant who is a small business, no award of punitive damages shall exceed fifty thousand dollars ($50,000) or 10 percent of the business' net worth, whichever is greater.
"(c) `Small business' for purposes of this section means a business having a net worth of two million dollars ($2,000,000) or less at the time of the occurrence made the basis of the suit.
"(d) Except as provided in subsection (j) in all civil actions for physical injury wherein entitlement to punitive damages shall have been established under applicable laws, no award of punitive damages shall exceed three times the compensatory damages of the party claiming punitive damages or one million five hundred thousand dollars ($1,500,000), whichever is greater.
"(e) Except as provided in Section 6-11-27, no defendant shall be liable for any punitive damages unless that defendant has been expressly found by the trier of fact to have engaged in conduct, as defined in Section 6-11-20, warranting punitive damages, and such defendant shall be liable only for punitive damages commensurate with that defendant's own conduct.
"(f) As to all the fixed sums for punitive damage limitations set out herein in subsections (a)[,] (b) and (d), those sums shall be adjusted as of January 1, 2003, and as of January 1 at three-year intervals thereafter, at an annual rate in accordance with the Consumer Price Index rate.

*311 "(g) The jury may neither be instructed nor informed as to the provisions of this section.
"(h) This section shall not apply to class actions.
"(i) Nothing herein shall be construed as creating a right to an award of punitive damages or to limit the duty of the court, or the appellate courts, to scrutinize all punitive damage[s] awards, ensure that all punitive damage[s] awards comply with applicable procedural, evidentiary, and constitutional requirements, and to order remittitur where appropriate.
"(j) This section shall not apply to actions for wrongful death or for intentional infliction of physical injury.
"(k) `Physical injury' for purposes of this section, means actual injury to the body of the claimant proximately caused by the act complained of and does not include physical symptoms of the mental anguish or emotional distress for which recovery is sought when such symptoms are caused by, rather than the cause of, the pain, distress, or other mental suffering.
"(l) No portion of a punitive damage[s] award shall be allocated to the state or any agency or department of the state."
Section 4 of Act No. 99-358 states that the amended version of § 6-11-21 ("new § 6-11-21") applies only to cases filed more than 60 days after the effective date of Act No. 99-358, which was June 7, 1999. Act No. 2001-344 incorporated new § 6-11-21 into the Code of Alabama 1975, on May 1, 2001, omitting any reference to former § 6-11-21.
Under well-settled Alabama law, when a statute is amended or revised, the "old" statute is impliedly repealed to the extent that it is in conflict with the "new" statute. For example, in Allgood v. Sloss-Sheffield Steel & Iron Co., 196 Ala. 500, 501, 71 So. 724, 724-25 (1916), this Court stated:
"1. `Where an amendment is made that changes the old law in its substantial provisions, it must, by a necessary implication, repeal the old law so far as they are in conflict. And where a new law, whether it be in the form of an amendment or otherwise, covers the whole subject-matter of the former, and is inconsistent with it, and evidently intended to supersede and take the place of it, it repeals the old law by implication.' 36 Cyc. 1082(D); Scott v. Simons, 70 Ala. 352 [(1881)]; Ogbourne v. Ogbourne, 60 Ala. 616 [(1877)]; Cahall v. Citizens' etc., Ass'n, 61 Ala. 232 [(1878)]; Lemay v. Walker, 62 Ala. 39 [(1878)].
"2. `Generally speaking, where a statute is amended "so as to read as follows," the amendatory act becomes a substitute for the original, which then ceases to have the force and effect of an independent enactment; but this does not mean that the original is abrogated for all purposes, or that everything in the later statute is to be regarded as first enacted therein. On the contrary, the better and prevailing rule is that so much of the original as is repeated in the later statute without substantial change is affirmed and continued in force without interruption; that so much of the act as is omitted is repealed; and that any substantial change in other portions of the original act, as also any matter which is entirely new, is operative as new legislation.' 36 Cyc. 1083(2); O'Rear v. Jackson, 124 Ala. 298, 26 South. 944 [(1899)]; In re Estate of Prime, 136 N.Y. 347, 32 N.E. 1091, 18 L.R.A. 713 [(1893)]; Moore v. Mausert, 49 N.Y. 332 [(1872)]; Pacific, etc., Co. v. Joliffe, 2 Wall. 450, 69 U.S. 450, 17 *312 L.Ed. 805 [(1864)]; Murdock v. Memphis, 20 Wall. 590, 617, 22 L.Ed. 429 [(1874)]; Bear Lake, etc., Co. v. Garland, 164 U.S. 1, 17 Sup.Ct. 7, 41 L.Ed. 327 [(1896)]; Great Northern Ry. Co. v. United States, 155 Fed. 945, 84 C.C.A. 93 [(1907)], affirmed in 208 U.S. 452, 28 Sup.Ct. 313, 52 L.Ed. 567 [(1908)], citing many other cases."
See also Fletcher v. Tuscaloosa Fed. Sav. & Loan Ass'n, 294 Ala. 173, 176-77, 314 So.2d 51 (1975), quoting with approval the first paragraph of the excerpt from Allgood set out above. In Mitchell v. Walden Motor Co., 235 Ala. 34, 36, 177 So. 151, 153 (1937), this Court stated:
"The general rule as to the construction of statutes thus amended is well settled and given recognition in Allgood v. Sloss-Sheffield Steel & Iron Co., 196 Ala. 500, 71 So. 724 [(1916)], wherein is the following quotation here applicable: `Generally speaking, where a statute is amended "so as to read as follows," the amendatory act becomes a substitute for the original, which then ceases to have the force and effect of an independent enactment ... that so much of the act as is omitted is repealed.'"
This Court stated in Fletcher:
"Repeal by implication is admittedly not a favored rule of statutory construction, but in State v. Bay Towing and Dredging Company, 265 Ala. 282, 289, 90 So.2d 743, 749 (1956), we find:
"`In Alabama, the law governing implied repeals is well-settled and the cases on this point are singularly consistent. See 18 Ala. Dig., Statutes, Key 159 & 160. A concise statement of the rule is contained in City of Birmingham v. Southern Express Co., 164 Ala. 529, 538, 51 So. 159, 162 [(1909)]:
"`"Repeal by implication is not favored. It is only when two laws are so repugnant to or in conflict with each other that it must be presumed that the Legislature intended that the latter should repeal the former...."
"`Implied repeal is essentially a question of determining the legislative intent as expressed in the statutes. Ex parte Jones, 212 Ala. 259, 260, 102 So. 234 [(1924)]. When the provisions of two statutes are directly repugnant and cannot be reconciled, it must be presumed that the legislature intended an implied repeal, and the later statute prevails as the last expression of the legislative will. Union Central Life Insurance Co. v. State, 226 Ala. 420, 423, 147 So. 187 [(1933)]; Fidelity & Deposit Co. of Maryland v. Farmers' Hardware Co., 223 Ala. 477, 479, 136 So. 824 [(1931)].'
"As noted, section 1 of Act No. 99-358, which enacted new § 6-11-21, states: "Section 6-11-21, Code of Alabama 1975, is amended to read as follows." As also already noted, this Court stated in Allgood, 196 Ala. at 501, 71 So. at 724, and again in Mitchell, 235 Ala. at 36, 177 So. at 153:
"... `Generally speaking, where a statute is amended "so as to read as follows," the amendatory act becomes a substitute for the original, which then ceases to have the force and effect of an independent enactment ... that so much of the act as is omitted is repealed.'"
(Emphasis supplied.) Although section 4 of Act No. 99-358 provided that the new § 6-11-21 applied to actions commenced 61 days after the effective date, section 5 provided that the Act became effective immediately upon its passage and final approval by the governor. As of the effective date of the Act, former § 6-11-21 was *313 invalidated. That no statutorily imposed punitive-damages cap was in place from either the June 7, 1999, effective date, until 61 days later presents no anomaly; the Legislature would have understood that the punitive-damages cap of former § 6-11-21 was not in effect, given this Court's opinion in Henderson approximately six years earlier. This Court noted in Wright v. Turner, 351 So.2d 1, 4 (Ala.1977),
"the long-standing maxim of statutory construction that a reviewing court is bound to presume that the legislature, when amending a statute, was aware of the judicial construction placed upon it and that, absent indications of intent to the contrary, the legislature did not see fit to change such judicial construction in the court of the amendment."
See also Ex parte Alabama Alcoholic Beverage Control Bd., 683 So.2d 952, 956 (Ala.1996).
Accordingly, former § 6-11-21 would not be revived even if we overruled Henderson, and we, therefore, have no occasion to address that possibility further in this case.

II. Clear and Convincing Evidence of Wanton Conduct
Shiv-Ram contends that the trial court erred in finding that Linda presented clear and convincing evidence of wantonness as required by Ala.Code 1975, § 6-11-20 and in denying its judgment as a matter of law as to punitive damages. "`An appellate court, when reviewing a ruling on a motion for a judgment as a matter of law, uses the same standard the trial court used initially in granting or denying the motion.'" Jim Walter Homes, Inc. v. Nicholas, 843 So.2d 133, 135 (Ala.2002) (quoting Bell v. T.R. Miller Mill Co., 768 So.2d 953, 956 (Ala.2000)). Ex parte Norwood Hodges Motor Co., 680 So.2d 245 (Ala.1996), sets out the standard a trial judge is to use when a defendant objects to the submission of the question of punitive damages to the jury: "[W]hether there was evidence of such quality and weight that a jury of reasonable and fair-minded persons could find by clear and convincing evidence that the defendant consciously or deliberately engaged in [wantonness]." 680 So.2d at 249.
Section 6-11-20(a) states, in part:
"Punitive damages may not be awarded in any civil action, except in civil actions for wrongful death pursuant to Sections 6-5-391 and 6-5-410, other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff."
Section 6-11-20(b)(3) defines wantonness as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." "`To prove wantonness, it is not essential to prove that the defendant entertained a specific design or intent to injure the plaintiff.'" Lance, Inc. v. Ramanauskas, 731 So.2d 1204, 1211 (Ala.1999) (quoting Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250, 1250 (Ala.1998)). "`Clear and convincing evidence' is `[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.' Ala.Code 1975, § 6-11-20(b)(4)." Hobart Corp. v. Scoggins, 776 So.2d 56, 58 (Ala.2000) (emphasis omitted).
Shiv-Ram argues that because it took possession of the motel on the day before Linda was injured, "one day of active ownership and control forecloses an opportunity to learn from direct experience *314 about any hazards associated with the motel or any genuine opportunity to correct any hazards that did exist." Although one day of active ownership and control might not have provided Shiv-Ram a full opportunity to learn "from direct experience" about any and all hazards related to the motel, or to correct any hazards, Shiv-Ram entered into the purchase agreement with AMA approximately four months before the closing date. As noted earlier, that agreement stipulated that Shiv-Ram was purchasing the motel "as-is, where is," "with no warranties by the Seller as to merchantability, suitability, or fitness for any particular use," and that Shiv-Ram was "relying solely on its own inspections" of the premises. Shiv-Ram acknowledged in the purchase agreement that it had been given a "sufficient opportunity to inspect the property." Thus, the purchase agreement provided Shiv-Ram with four months between the execution of the purchase agreement and the planned "seamless transition" to inspect the premises and the records related to the premises for the purpose, among other things, of addressing the known deteriorated condition of the motel. Neither Jay Patel nor any other representative of Shiv-Ram attempted to inspect the premises or the records or to meet with any on-site employees.
"[The defendant] maintains that it did not have actual knowledge of the condition [of its vending machine], and that, therefore, it could not foresee that injury to a third party could occur. However, the test is not what [the defendant] in fact knew, but whether it was reasonably foreseeable that a failure to maintain the vending machine in a safe condition could cause injury to a third party."
Lance, 731 So.2d at 1209. Wantonness can consist of "`the conscious doing of some act or omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act injury will likely or probably result.'" Lance, 731 So.2d at 1211 (quoting Roush, 723 So.2d at 1250) (emphasis supplied). "[T]o establish wantonness, the plaintiff must `prove that the defendant caused harm by the conscious doing of some act or the conscious omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury would likely or probably result.'" Kmart Corp. v. Peak, 757 So.2d 1138, 1144 (Ala.1999) (first emphasis in original; second emphasis added) (punitive-damages award upheld because there was "substantial evidence of wantonness and clear and convincing evidence that [the defendant] acted with `a reckless or conscious disregard of the rights or safety of others'" under Ala.Code 1975, § 6-11-20(b)(3)).
"The hotel keeper must furnish safe premises for the guest, which they may use in the ordinary and reasonable way without danger; and if any guest, while using the building where she is reasonably expected to go, is injured by a defective condition of the building, the manager is liable for the injuries to his guest that are approximately caused by his negligence in the defective condition."
Dye-Washburn Hotel Co. v. Aldridge, 207 Ala. 471, 474, 93 So. 512, 514 (1922). Moreover, a premises owner owes any business invitee" `a duty to exercise reasonable care to maintain its premises in a reasonably safe condition.'" Kmart Corp., 757 So.2d at 1144, quoting Norris v. Wal-Mart Stores, Inc., 628 So.2d 475, 477 (Ala.1993).
We conclude that there was substantial evidence of wantonness and clear and convincing evidence that Shiv-Ram acted with a reckless or conscious disregard of the rights or safety of others in its conscious omission of its duty to furnish safe premises *315 to Linda McCaleb. Had Shiv-Ram pursued any of the opportunities it had to fulfill its duty to furnish safe premises that its guests might use in the ordinary and reasonable way without danger, it would have protected guests such as Linda from what was in fact a prevalent, dangerous defect in the king-sized beds in the motel. Instead, it chose to turn a blind eye and a deaf ear to the situation and to forgo making even the most cursory inspections or inquiries concerning the safety of the guest rooms. Had it made a reasonable inspection, or had it made any inquiry of either Mona Smith or Jarvis Bailey, it would have readily learned of the dangers inherent in the structures of the king-sized bed it was offering its guests. We conclude that Shiv-Ram was sufficiently alerted during the three and one-half months preceding the June 13 closing of the possibility, if not probability, of potential safety hazards in the guest rooms.
Shiv-Ram argues that because Ramada itself undertook an inspection of the motel on May 14, 1997, and failed to note any problems with bed frames, Shiv-Ram had no reason to anticipate that a problem existed with the king-sized bed frames. The Ramada inspection covered only 18 of the 98 rooms in the motel, however, and the record does not reflect how many of the inspected rooms contained king-sized beds, which were the beds that had the problem with the bed frames. Rather, Jay simply answered affirmatively when asked by Shiv-Ram's counsel if, "[w]ithin these rooms listed, were there king-size beds in those rooms?" We know that Linda's room was not included in Ramada's inspection and, for all that appears, only a few of the rooms outfitted with king-sized beds were included in the 18 rooms that were inspected. There were approximately 25 to 30 king-sized beds located throughout the motel. There was ample testimony that the protruding piece of bed frame was not readily observable unless the bedspread was lifted to expose it, and nothing in the record suggests that the inspection by Ramada extended to lifting the bedspreads. Accordingly, the fact that Ramada conducted an "inspection" would not excuse Shiv-Ram's intentional omission of its independent duty to furnish safe premises to its guests for use in the ordinary and reasonable way without danger. In Wal-Mart Stores, Inc. v. Thompson, 726 So.2d 651 (Ala.1998), a case relied on by Shiv-Ram as support for its argument that the omissive conduct in question did not constitute wantonness, the Court noted that after Wal-Mart had become aware of two or three reports of merchandise falling from upper shelves in the display area in a store, "it had instituted many thorough safety procedures in order to insure the safety of its customers.... [U]sing vigorous safety policies, like these Wal-Mart had in place, to support a claim of wantonness is equivalent to punishing someone for taking precautions to avoid causing injury." 726 So.2d at 653.

III. Excessiveness of Punitive Damages
Shiv-Ram contends that the punitive-damages award violates the constitutional standards set out by the United States Supreme Court in BMW of North America, Inc. v. Gore, supra, and the factors adopted by this Court in Hammond and Green Oil, supra, in light of the "limited reprehensibility" of its conduct. "We recently announced that in Alabama punitive-damages awards are subject to a de novo standard of review, in accordance with the recent holding of the United States Supreme Court. See Acceptance Ins. Co. v. Brown, 832 So.2d 1 (Ala.2001), citing Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 121 S.Ct. *316 1678, 149 L.Ed.2d 674 (2001)." National Ins. Ass'n v. Sockwell, 829 So.2d 111, 135 (Ala.2002). Thus, we must first analyze the "guideposts" set out in Gore, and because "[w]e have determined that the [United States] Supreme Court's requirement that a court consider these new guideposts does not preclude a court from considering the factors set out earlier in Hammond and Green Oil," AutoZone, Inc. v. Leonard, 812 So.2d 1179, 1187 (Ala.2001), we will also consider those additional factors.

A. Gore Guideposts
In Gore, the United States Supreme Court set out three "guideposts" for courts to look to when reviewing a punitive-damages award. Those guideposts, as most recently restated in State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 418, 123 S.Ct. 1513, 1520, 155 L.Ed.2d 585 (2003), are as follows: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."
Reprising its criteria for analysis of reprehensibility in Gore, the Campbell Court stated that to determine a defendant's reprehensibility  "the most important indicium of the reasonableness of a punitive damages award"  a court must consider "whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm resulted from intentional malice, trickery, or deceit, or mere accident." 538 U.S. at 419, 123 S.Ct. at 1521.

1. Reprehensibility of Shiv-Ram's conduct.
Applying the Gore criteria relevant to determining reprehensibility, as restated in Campbell, we note that the harm caused in this case was physical as opposed to economic. As we concluded earlier, Shiv-Ram's tortious omission even minimally to attempt to satisfy its legal duty to the guests at the motel evidenced an indifference to, or a reckless disregard of, the health or safety of others. We have no information from which we can assess whether the motel guests, who would be the "target" of that total omission, were financially vulnerable. The inaction and omissions by Shiv-Ram involved repeated actions in one sense, inasmuch as they were individually disregarded as to each guest who checked into the motel from the time Shiv-Ram took over the operations of the motel on June 13. The omissions involved repeated inaction in another sense, in that Shiv-Ram knew that its duty to motel guests would fully ripen immediately upon its assuming ownership and management of the motel on June 13, and it knew that the motel had been allowed to deteriorate greatly over the course of several months, yet it consciously elected, throughout the four months it had to inspect and make inquiries, to employ a "don't ask, don't tell" policy. It knew that it planned a "seamless transition" and that it would not undertake any inspections or inquiries once it took over the operation and management of the motel. Shiv-Ram was well experienced in the management of motels, yet intentionally refused to expose itself to any information concerning the safety of its guest rooms that might have derailed to any degree the desired "seamless transition" and the consequent uninterrupted flow of rental income.

*317 2. Ratio of punitive damages to compensatory damages.
Under Gore, 517 U.S. at 575, 116 S.Ct. 1589, and Campbell, 538 U.S. at 419, 123 S.Ct. at 1521, we presume that Linda has been made whole for injuries by the compensatory-damages award, but we do not consider that the ratio between the punitive-damages award and the compensatory-damages award of slightly less than three to one is unreasonable. See AutoZone, 812 So.2d at 1187, approving a ratio of punitive damages to compensatory damages of 3.7:1, despite the fact that all of the $75,000 compensatory-damages award in excess of $3,000 necessarily related to mental anguish. (One Justice who dissented from the affirmance of the punitive-damages award would have remitted that award to a level where the ratio to compensatory damages would have been exactly three to one. 812 So.2d at 1188.) Subsequently, in Campbell, the United States Supreme Court observed that, based on prior caselaw, in practice few awards exceeding to a significant degree a single-digit ratio between punitive and compensatory damages would satisfy due process and acknowledged that in both Gore and Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), it had approved a 4:1 ratio. Accordingly, we find the ratio of punitive damages to compensatory damages to be reasonable.

3. Civil penalties that could be imposed.
Regarding the third Gore guidepost, a comparison of the punitive-damages award to the civil penalties that could be imposed for comparable misconduct, the parties concede that there is no particular law that would encompass the conduct in this case; thus, this factor is not applicable.

4. Summary of Gore guideposts.
Our analysis of the Gore guideposts, particularly the degree of reprehensibility and the low ratio of punitive damages to compensatory damages, persuades us that a $500,000 punitive-damages award is not unreasonable.

B. Hammond/Green Oil Factors
Next, we look to the factors enumerated by this Court in Hammond and Green Oil, supra. Those factors are: (1) the reprehensibility of Shiv-Ram's conduct; (2) the relationship of the punitive-damages award to the harm that actually occurred, or is likely to occur, from Shiv-Ram's conduct; (3) Shiv-Ram's profit from its misconduct; (4) Shiv-Ram's financial position; (5) the cost to Linda of the litigation; (6) whether Shiv-Ram has been subject to criminal sanctions for similar conduct; and (7) other civil actions Shiv-Ram has been involved in arising out of similar conduct.

1. Reprehensibility.
"Our assessment of the degree of the reprehensibility of the defendant's conduct is broader in a Hammond/Green Oil review than our assessment in a [Gore] review." Employees Benefit Ass'n v. Grissett, 732 So.2d 968, 980 (Ala.1998). In that regard, we consider "`[t]he duration of the conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover up" of that hazard, and the existence and frequency of similar past conduct.'" Green Oil, 539 So.2d at 223 (quoting Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1062 (Ala.1987) (Houston, J., concurring specially)). In a footnote in its principal appellate brief, Shiv-Ram states:
"Shiv-Ram concedes that the case of Lance, Inc. v. Ramanauskas, 731 So.2d 1204 (Ala.1999), states that post-incident *318 conduct may be considered as to the `duration' component of reprehensibility Id. at 1211. While Shiv-Ram questions whether it should be `punished' for acts occurring subsequent to those complained of by the plaintiff here and further believes Lance, Inc., may be distinguishable because the defendant there did not object to such `after the fact' evidence, id., Shiv-Ram concedes Lance, Inc. may require a broader conception of `duration' than the foregoing analysis suggests and invites the Court to note that there is simply no evidence in the record that anyone was harmed on any bed after McCaleb's alleged injury."
Conversely, there is no evidence in the record indicating that "anyone was [not] harmed on any bed after McCaleb's alleged injury." As noted, the customary practice in the hotel industry of preparing an incident report and a work order for repairs following an injury to a guest caused by room furnishings was not followed in Linda's case, and nothing suggests that a record would have been made of an injury to any other guest. Ray Patel testified that the rail projections on the metal bed frames still existed two and one-half years after Linda was injured. Neither side inquired of Ray as to whether during that period any employee or guest had sustained an injury from striking the projecting sharp ends of the bed frames. As this Court noted in Lance, 731 So.2d at 1218, "[the injured party] provided ample evidence that [the defendant] has not taken remedial steps to prevent similar [injuries] from occurring." Ray's testimony was admissible at the postjudgment hearing on the alleged excessiveness of the punitive damages because it was offered to show that Shiv-Ram never intended to improve the safety of the beds in the rooms it rented to the public and that, therefore, its conduct was wanton. Macon County Comm'n v. Sanders, 555 So.2d 1054, 1057-58 (Ala.1990).
Shiv-Ram does not challenge on appeal the propriety of the trial court's consideration of Ray Patel's testimony in making its independent assessment of the propriety of the amount of the punitive-damages award. Moreover, it was arguably admissible at the postjudgment hearing under the express language of § 6-11-23, Ala.Code 1975, permitting "[a]ny relevant evidence, including but not limited to ... the nature and the extent of any effort the defendant made to remedy the wrong...." Because a review of the reprehensibility factor is more narrow under Gore and because we have concluded that Shiv-Ram's conduct was reprehensible under Gore, we need not readdress reprehensibility in our Hammond/Green Oil analysis. Therefore, this factor weighs against a remittitur of the $500,000 punitive-damages award.

2. The relationship of the punitive-damages award and the harm actually or likely to occur.
"`"Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater."'
"Green Oil, 539 So.2d at 223, quoting Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1062 (Ala.1987) (Houston, J., concurring specially)."
Sockwell, 829 So.2d at 138.
In this case, as a result of Shiv-Ram's failure to properly inspect or to inquire about the motel premises at any time before or after the closing date, the injury suffered by Linda was significant *319 and ongoing. Also, under Shiv-Ram's ownership, injuries to other patrons and employees were likely to occur; it took only one day of its ownership for Linda to be injured. This factor weighs against a finding that the punitive-damages award is excessive.

3. Shiv-Ram's profit from its misconduct.
Shiv-Ram argues that it made no profit from its misconduct, and that, even if it did, the profit was offset by the compensatory damages that were awarded. It is apparent that Shiv-Ram did save money by not replacing the bed frames or otherwise correcting the dangerous condition. However, as Linda conceded in her brief to this Court, because the minimal savings Shiv-Ram enjoyed by failing to replace the frame did not have a significant impact on its profitability, this factor weighs in favor of a finding that the punitive-damages award is excessive. Grissett, 732 So.2d at 981.

4. Shiv-Ram's financial position.
Shiv-Ram concedes that it has liability insurance and it proffers no evidence that payment of the damages awarded will cause it any undue financial hardship. Therefore, this factor weighs against a finding of excessiveness. Lance, 731 So.2d at 1220.

5. Costs of litigation.
Our analysis of this factor requires us to determine whether the punitive-damages award is adequate to reward Linda's counsel for assuming the risk of bringing the action and to encourage other potential plaintiffs to bring wrongdoers to trial. Green Oil, 539 So.2d at 223. Linda has conceded in her brief to this Court that this factor may be ignored in our review of the punitive-damages award. (Linda's brief at 62.) Thus, this factor is neutral as to whether there should be a remittitur of the punitive-damages award. Lance, 731 So.2d at 1220.

6. Criminal sanctions.
There is no evidence indicating that Shiv-Ram has been subject to any criminal sanctions for similar conduct; therefore, this factor does not require a remittitur. Lance, 731 So.2d at 1219.

7. Other civil actions.
There is no evidence indicating that Shiv-Ram has been subject to any other civil actions based on similar conduct; therefore, this factor does not require a remittitur. Lance, 731 So.2d at 1219.

8. Summary of the Hammond/Green Oil factors.
After considering the Hammond/Green Oil factors, we conclude that only one of the factors (i.e., the fact that Shiv-Ram has not profited from its misconduct) weighs in favor of a finding of excessiveness. The other six factors are either inapplicable or weigh against a finding of excessiveness.

C. Final Analysis of Punitive-Damages Award
In light of our conclusion that the Gore guideposts and the Hammond/Green Oil factors do not require a remittitur, we hold that the $500,000 punitive-damages award is reasonable and is a sufficient amount to punish Shiv-Ram and deter it from similar conduct in the future, without compromising its due-process rights. Therefore, the judgment of the trial court is affirmed.
AFFIRMED.
*320 LYONS, JOHNSTONE, and WOODALL, JJ., and GORDON, Special Justice,[*] concur.
HOUSTON, SEE, BROWN, and STUART, JJ., dissent.
HOUSTON, Justice (dissenting).
Shiv-Ram contends that this Court should overrule our previous decision in Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993), so as to allow former § 6-11-21, limiting punitive damages to no more that $250,000, to govern in this case, which was filed on September 14, 1998, well before the June 7, 1999, effective date of the amendment to § 6-11-21, which, among other things, increased the cap in these type cases to $500,000. I agree, and I dissent from the majority opinion because it holds that the "new" § 6-11-21 applies to this case.
In Henderson, an individual suffered severe burns to his body while climbing on a tower supporting high-voltage transmission lines serviced by Alabama Power Company (hereinafter referred to as "APCo"). He brought a personal-injury action against APCo, and in the process challenged the constitutionality of the then existing version of § 6-11-21. Section 6-11-21 as it then existed set the maximum amount of punitive damages recoverable at $250,000, subject to some exceptions not applicable to that case or to the present one. At the time the Court decided Henderson, § 6-11-21 provided:
"An award of punitive damages shall not exceed $250,000, unless it is based upon one or more of the following:
"(1) A pattern or practice of intentional wrongful conduct, even though the damage or injury was inflicted only on the plaintiff; or
"(2) Conduct involving actual malice other than fraud or bad faith not a part of pattern or practice; or
"(3) Libel, slander, or defamation."
Holding that § 6-11-21 was unconstitutional, this Court stated in Henderson:
"[A] limitation on punitive damages such as that imposed by § 6-11-21 clearly impairs the traditional function of the jury.
"In performing this function, the jury is an institution of the body politic. In a jury, citizens exercise direct democracy, whereas the legislature consists of representatives of the people, exercising the people's power and doing their will only indirectly. The jury serves as the conscience of the community. It acts in particular cases, whereas the legislature makes rules for general classes of situations. Legislation cannot take into account the particular circumstances of a particular wrong.
"This Court, in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), articulated, clarified, and refined the common law mechanism of remittitur, so as to protect defendants on a case by case basis from verdicts so excessive or out of proportion to the wrong or to the individual defendant as to violate the defendant's right not to be deprived of property without due process of law. A legislative act that is not so particularized is a grave imposition on the discretion that has always been given to juries.
"Such a limitation could properly be imposed by constitutional amendment, in which the people exercise direct democracy, *321 just as they do when they serve on juries. If the people, as amenders of their constitution, wish to limit their power as jurors, they can do so. Section 11 of the Constitution [of Alabama] [right to trial by jury] reserves this power of the people out of the powers granted to the legislature."
627 So.2d at 893 (Ala.1993) (emphasis omitted).
I wrote a dissenting opinion in Henderson, which Justices Maddox and Steagall joined. In that opinion I stated:
"The idea that punitive damages are awarded solely for the purpose of vindicating and protecting society's interests by punishing those who engage in egregious tortious conduct and deterring them and others from engaging in such conduct in the future, and the idea that only an amount necessary to accomplish these goals may be awarded, have been restated many times since Meighan [v. Birmingham Terminal Co., 165 Ala. 591, 598-99, 51 So. 775, 777-78 (1910)]. See e.g., Industrial Chemical & Fiberglass Corp. v. Chandler, 547 So.2d 812, 837 (1988):
"`Although not imposing the stigma of crime or the unique burdens of imprisonment, punitive damages nonetheless serve to place the defendant on notice that it has engaged in conduct considered intolerable by society and also serves to deter others from following the defendant's example. But in levying a punitive award, the degree or amount must be comparable to the act deserving punishment. And though the defendant has engaged in intolerable conduct, it does not surrender its right to "fair" punishment; in other words, "although punitive damages need bear no particular relationship to actual damages, they, nonetheless, must not exceed an amount that will accomplish society's goals of punishment and deterrence." Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), citing Maryland Casualty Co. v. Tiffin, 537 So.2d 469 (Ala.1988), City Bank of Alabama v. Eskridge, 521 So.2d 931 (Ala.1988), and Roberson v. Ammons, 477 So.2d 957 (Ala.1985).'
"Consequently, before the ratification of the 1901 Constitution, if the defendant was not shown to be guilty of the kind of egregious conduct that was contemplated by the common law as deserving of punishment, then the jury had no legal authority to award punitive damages. Furthermore, in cases involving egregious conduct, discretionary awards of punitive damages by juries were subject to post-judgment review by the courts under an abuse of discretion standard. Thus, the kind of discretion that juries were allowed to exercise at common law before the ratification of the 1901 Constitution was a limited discretion, which this Court has compared to the kind of `legal' discretion that is routinely exercised by courts. Coleman v. Pepper, 159 Ala. 310, 49 So. 310 (1909). Black's Law Dictionary 466-67 (6th ed.1990), under `Discretion,' defines `judicial and legal discretion,' in pertinent part, as follows:
"`These terms are applied to the discretionary action of a judge or court, and mean discretion bounded by the rules and principles of law, and not arbitrary, capricious, or unrestrained. It is not the indulgence of a judicial whim, but the exercise of judicial judgment, based on facts and guided by law, or the equitable decision of what is just and proper under the circumstances. It is a legal discretion to be exercised in discerning the course prescribed by law and is *322 not to give effect to the will of a judge, but to that of the law.... A liberty or privilege to decide and act in accordance with what is fair and equitable under the peculiar circumstances of the particular case, guided by the spirit and principles of the law....'
"....
"It is clear, therefore, that before the ratification of the 1901 Constitution, an individual had the right in certain cases to have a jury make the factual determination as to whether punishment was necessary to protect society's interests and to have the jury award punitive damages if the jury was so inclined. This right received constitutional protection by virtue of § 11. However, it is equally clear that in performing its factfinding function before the ratification of the Constitution in 1901, the jury was always subject to the rule of law in exercising its discretion. The jury could award punitive damages only in those cases involving egregious tortious conduct on the part of the defendant, and any award made by the jury in such a case could not exceed an amount that would accomplish society's goals of punishment and deterrence. When the Constitution of 1901 was ratified, it was the right of an individual to have a jury act as factfinder and to return a verdict in accordance with the rules of law applicable to the particular case that was afforded constitutional protection by § 11. Before the ratification of the 1901 Constitution, there was no legislative restriction on the exercise of a jury's discretion in awarding punitive damages, such as the one at issue in this case. In other words, the legislature had taken no steps to declare the maximum amount that could be awarded by the jury to vindicate and protect society's interests. It was the function of the court to declare what this amount was on a case-by-case basis and to order a remittitur if necessary. Although § 11 prohibited legislative interference with an individual's common law right to have a jury perform its historic factfinding function, § 11 did not confer upon an individual the right to have a jury perform this function in a vacuum, i.e., freed from the guidance or control of the law.
"Section 6-11-21 represents a change in the law only in the sense that it declares the maximum amount that is allowable to accomplish society's goals of punishment and deterrence. Section 6-11-21 did not affect the discretionary authority that the jury had, before the ratification of the 1901 Constitution, to award punitive damages. The jury has never been allowed to award more than an amount deemed necessary by society to punish and deter. Who has the authority to determine the outer limits of punishment and deterrence? Those duly elected by a majority of Alabamians to make law, or 12 people randomly selected from driver's license records, who have survived challenges for cause, Batson challenges, and peremptory challenges of attorneys for particular parties in a particular civil action? I have to believe that those duly elected, not those randomly selected, have the power to determine what is a maximum amount needed to punish and deter. When viewed from this perspective, it is clear that § 6-11-21 did not change the law, at least with respect to the extent of the jury's discretion to award punitive damages, and, therefore, that it does not violate § 11.
"....
"The legislature's power to regulate punitive damages is derived from two provisions in the Alabama Constitution. `The legislative power of this state shall *323 be vested in a legislature' (Art. IV, § 44). `It is of course well understood that the only authority which has the power to make State laws is the legislature. Section 44, Constitution.' Personnel Board of Mobile County v. City of Mobile, 264 Ala. 56, 60-61, 84 So.2d 365, 369 (1955).... `Section 44 of the Constitution is the express constitutional provision for representative government.' Opinion of the Justices No. 263, 379 So.2d 939, 940 (Ala.1980). '"It [representative government] is based on the concept that democratic government functions best through a written Constitution vesting the full legislative power in representatives chosen by the people...."' Opinion of the Justices No. 201, 287 Ala. 321, 323, 251 So.2d 739, 741 (1971) (quoting Opinion of the Justices No. 36, 232 Ala. 56, 166 So. 706 (1936)).
"As previously discussed, according to the plain wording of Art. IV, § 104(28), the legislative department of government has the power to `remit ... penalties,' if it does so by general law. Section 6-11-21 is a general law. `Penalty' includes punitive damages. `Remit' means to `give up' or `reduce.' `The state had the right to remit punitory damages ...,' Meighan, 165 Ala. at 599, 51 So. at 778, if it did so by a general law, which § 6-11-21 is.
"All Justices agree that no citizen has a right to recover punitive damages; therefore, there is no life, liberty, or property interest of a plaintiff involved where punitive damages are concerned. State ex rel. Galanos v. Mapco Petroleum, Inc., 519 So.2d 1275, 1277 (Ala.1987), stands for the proposition that if two provisions of the Constitution are seen to conflict and one of them is contained in Art. I, the Declaration of Rights, the provision from the Declaration of Rights will prevail. State ex rel. Galanos specifically involves § 35, `Objective of Government.' This has paramountcy among constitutional provisions:
"`[T]he sole and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when government assumes other functions it is usurpation and oppression.'
"Government includes the judiciary:
"`The powers of the government of the State of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.'
"Section 42, Constitution....
"Since we all agree that a plaintiff has no life, liberty, or property interest in an award of punitive damages, the only legitimate end of government in connection with the issue of punitive damages is to protect a defendant's property interest in not having to pay punitive damages that would exceed government's goal of punishment and deterrence. I believe that government, in its legislative capacity, set society's goal of punishment and deterrence by enacting § 6-11-21. Whether this was wise or needed is not for the judiciary to say, because the legislature was not prohibited by the Constitution from enacting § 6-11-21. Not only was the legislature not prohibited from enacting § 6-11-21, it was expressly empowered to do so by the Constitution (§ 104(28)). I believe that government, in its judicial capacity, as represented by the majority opinion in this case has assumed functions other than protecting `the citizen in the enjoyment of life, liberty, and property' when *324 it strikes down § 6-11-21 as violating § 11 of the Constitution.
"....
"The people spoke through their legislature in 1987. The people spoke after all sides had been heard. The best and the brightest advocated or opposed a fixed limitation on punitive damages. What is now § 6-11-21 was legally adopted by a duly elected legislature, and it was approved by a duly elected governor. This was representative democracy at work. If excessiveness of a punitive damages award is raised, should not I, as an appellate court judge, treat $250,000 as the outer limit of what society deems necessary in the way of punishment and deterrence for civil wrongs (except those for which the limit was not made applicable)."
Henderson, 627 So.2d 878, 910-14 (Ala.1993) (Houston, J., dissenting) (footnotes and emphasis omitted).
Since that time, the soundness of the rationale of Henderson has been seriously and repeatedly questioned. See, e.g., Ex parte Apicella, 809 So.2d 865, 874 (Ala.2001) (a plurality agreed that "[t]o the extent they held that § 11 restricted the Legislature from removing from the jury the unbridled right to punish, Henderson and [Smith v.] Schulte[, 671 So.2d 1334 (Ala.1995),][2] were wrongly decided."); Goodyear Tire & Rubber Co. v. Vinson, 749 So.2d 393 (Ala.1999) (Houston, See, Lyons, and Brown, JJ., concurring specially) (in which I reiterated my dissent from Henderson and a plurality of justices separately expressed doubt as to whether Henderson was decided correctly, but noted that that question was not before the Court); Oliver v. Towns, 738 So.2d 798, 804 n. 7 (Ala.1999)(stating that "we question whether Henderson remains good law").
Henderson has been duly and properly challenged in this case. I believed when that case was decided, and I believe now, that Henderson was incorrectly decided. I would overrule Henderson and hold that the former § 6-11-21 still has operation to this case, and, thus, that the $500,000 punitive-damages award rendered in favor of Linda exceeds the applicable $250,000 cap.
Linda argues that as a consequence of the Legislature's enactment of Act No. 99-358, Ala. Acts 1999, and Act No. 2001-344, Ala. Acts 2001, the former § 6-11-21 was impliedly repealed, and, therefore, cannot be revived. Act No. 99-358 amended former § 6-11-21. Specifically, Act No. 99-358 states, in pertinent part:
"Section 1. Section 6-11-21, Code of Alabama 1975, is amended to read as follows:
"(a) Except as provided in subsections (b), (d), and (j) in all civil actions where an entitlement to punitive damages shall have been established under applicable laws, no award of punitive damages shall exceed three times the compensatory damages of the party claiming punitive damages or five hundred thousand dollars ($500,000), whichever is greater.
"....
"(d) Except as provided in subsection (j) in all civil actions for physical injury wherein entitlement to punitive damages shall have been established under applicable laws, no award of punitive damages shall exceed three times the compensatory damages of the party claiming punitive damages or one million five hundred thousand dollars ($1,500,000), whichever is greater.

*325 "....
"(k) `Physical injury' for purposes of this section, means actual injury to the body of the claimant proximately caused by the act complained of and does not include physical symptoms of the mental anguish or emotional distress for which recovery is sought when such symptoms are caused by, rather than the cause of, the pain, distress, or other mental suffering."[3]
Section 4 of Act No. 99-358 states that the amended version of § 6-11-21 ("new § 6-11-21") would apply only to actions filed more than 60 days after its June 7, 1999, effective date. Act No. 2001-344 incorporated Act No. 99-358, i.e., new § 6-11-21, into the Code of Alabama 1975, on May 1, 2001, omitting any reference to the former version of § 6-11-21.
Under well-settled Alabama law, when a statute is amended or revised, the "old" statute is impliedly repealed to the extent that it is in conflict with the amended statute. For example, in Allgood v. Sloss-Sheffield Steel & Iron Co., 196 Ala. 500, 71 So. 724, 724-25 (1916), this Court stated:
"1. `Where an amendment is made that changes the old law in its substantial provisions, it must, by a necessary implication, repeal the old law so far as they are in conflict. And where a new law, whether it be in the form of an amendment or otherwise, covers the whole subject-matter of the former, and is inconsistent with it, and evidently intended to supersede and take the place of it, it repeals the old law by implication.' 36 Cyc. 1082(D); Scott v. Simons, 70 Ala. 352 [(1881)]; Ogbourne v. Ogbourne, 60 Ala. 616 [(1877)]; Cahall v. Citizens' etc., Ass'n, 61 Ala. 232 [(1878)]; Lemay v. Walker, 62 Ala. 39 [(1878)].
"2. `Generally speaking, where a statute is amended "so as to read as follows," the amendatory act becomes a substitute for the original, which then ceases to have the force and effect of an independent enactment; but this does not mean that the original is abrogated for all purposes, or that everything in the later statute is to be regarded as first enacted therein. On the contrary, the better and prevailing rule is that so much of the original as is repeated in the later statute without substantial change is affirmed and continued in force without interruption; that so much of the act as is omitted is repealed; and that any substantial change in other portions of the original act, as also any matter which is entirely new, is operative as new legislation.' 36 Cyc. 1083(2); O'Rear v. Jackson, 124 Ala. 298, 26 South. 944 [(1899)]; In re Estate of Prime, 136 N.Y. 347, 32 N.E. 1091, 18 L.R.A. 713 [(1893)]; Moore v. Mausert, 49 N.Y. 332 [(1872)]; Pacific, etc., Co. v. Joliffe, 2 Wall. 450, 69 U.S. 450, 17 L.Ed. 805 [(1864)]; Murdock v. Memphis, 20 Wall. 590, 617, 22 L.Ed. 429 [(1874)]; Bear Lake, etc., Co. v. Garland, 164 U.S. 1, 17 Sup.Ct. 7, 41 L.Ed. 327 [(1896)]; Great Northern Ry. Co. v. United States, 155 Fed. 945, 84 C.C.A. 93 [(1907)], affirmed in 208 U.S. 452, 28 Sup.Ct. 313, 52 L.Ed. 567 [(1908)], citing many other cases."
Likewise, in Fletcher v. Tuscaloosa Federal Savings & Loan Association, 294 Ala. 173, 177, 314 So.2d 51, 54-55 (Ala.1975), with regard to implied repeal of a statute, this Court stated:

*326 "Repeal by implication is admittedly not a favored rule of statutory construction, but in State v. Bay Towing and Dredging Company, 265 Ala. 282, 289, 90 So.2d 743, 749 (1956), we find:
"`In Alabama, the law governing implied repeals is well-settled and the cases on this point are singularly consistent. See 18 Ala.Dig., Statutes, Key 159 & 160. A concise statement of the rule is contained in City of Birmingham v. Southern Express Co., 164 Ala. 529, 538, 51 So. 159, 162 [(1909)]:
"`"Repeal by implication is not favored. It is only when two laws are so repugnant to or in conflict with each other that it must be presumed that the Legislature intended that the latter should repeal the former...."'
"`Implied repeal is essentially a question of determining the legislative intent as expressed in the statutes. Ex parte Jones, 212 Ala. 259, 260, 102 So. 234 [(1924)]. When the provisions of two statutes are directly repugnant and cannot be reconciled, it must be presumed that the legislature intended an implied repeal, and the later statute prevails as the last expression of the legislative will. Union Central Life Insurance Co. v. State, 226 Ala. 420, 423, 147 So. 187 [(1933)]; Fidelity & Deposit Co. of Maryland v. Farmers' Hardware Co., 223 Ala. 477, 479, 136 So. 824 [(1931)].'"
"`Unless two statutes are in irreconcilable conflict, it is the court's duty to regard each as effective and to arrive at a construction that will harmonize the seeming conflict and give each statute a reasonable field of operation.'" Ex parte S.C.W., 826 So.2d 844, 850 (Ala.2001) (quoting and adopting Judge Crawley's dissent in S.C.W. v. C.B., 826 So.2d 825, 842 (Ala.Civ.App.2001)) (emphasis supplied).
In the instant case, as evidenced by the language in Act No. 99-358, the Legislature amended former § 6-11-21. Nowhere does the act express an intention on the part of the Legislature to repeal the statute. If anything, the prospective language in Act No. 99-358 expressly indicates that any change (be it by amendment or repeal) in the statute would be effectual only with respect to actions commenced more than 60 days after its effective date. In that regard, considering the plain language and the prospective nature of section 4 of the act, I believe that the Legislature did not intend to repeal former § 6-11-21, but rather intended for it to continue to apply to those actions filed as late as August 6, 1999. "`The cardinal rule of statutory interpretation is to determine and give effect to the intent of the legislature as manifested in the language of the statute.'" Ex parte Weaver, 871 So.2d 820, 823 (Ala.2003) (quoting Ex parte State Dep't of Revenue, 683 So.2d 980, 983 (Ala.1996)). See also Auburn Univ. v. Advertiser Co., 867 So.2d 293, 299 (Ala.2003); Ex parte Alabama Dep't of Mental Health & Retardation, 840 So.2d 863 (Ala.2002); Ex parte City of Haleyville, 827 So.2d 778 (Ala.2002). As noted, the McCalebs filed their action on September 14, 1998, well before the effective date of the new § 6-11-21. Thus, I believe that the former § 6-11-21, after our removal of the impediment to its enforceability created by Henderson, is applicable to this action as well as all other actions filed as late as August 6, 1999.
SEE, Justice (dissenting).
I believe that the main opinion erroneously affirms the punitive-damages award in favor of Linda McCaleb; therefore, I respectfully dissent.

*327 I.
In BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Supreme Court of the United States set out three guideposts for courts to use in determining whether a punitive-damages award is constitutionally permissible: (A) the degree of reprehensibility of the conduct; (B) the disparity between the harm or potential harm suffered by the plaintiff and the punitive-damages award; and (C) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

A. Reprehensibility of Shiv-Ram's conduct.
"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." 517 U.S. at 575, 116 S.Ct. 1589 (footnote omitted). A court assessing the reprehensibility of a defendant's conduct must consider "whether: [1.] the harm was physical as opposed to economic, [2.] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others, [3.] the target of the conduct had financial vulnerability, [4.] the conduct involved repeated actions or was an isolated incident, and [5.] the harm was the result of intentional malice, trickery, or deceit, or mere accident." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419, 123 S.Ct. 1513, 1521, 155 L.Ed.2d 585 (2003).

1. Whether the harm was physical as opposed to economic.
Shiv-Ram did cause physical harm; however, the physical harm manifested itself as a "goose egg" and a "speck of blood." Although Linda McCaleb saw 14 doctors 99 times as a result of her injury, there is no indication in the record as to why she visited 14 different doctors or why all of those visits were necessary to identify and address her injury, which appears not to have been severe. In any event, she has not demonstrated why the "goose egg" and "speck of blood" warrant a $500,000 punitive-damages award in addition to the substantial compensatory-damages award of $176,572.82.

2. Whether the tortious conduct evidenced indifference to or a reckless disregard of the health or safety of others.
Shiv-Ram's conduct did evidence some level of indifference to the health and safety of others in that Shiv-Ram failed to inspect the rooms and review the motel's records when it took over the operation of the motel; however, the motel had been inspected by a representative from Ramada Franchise Systems, Inc. ("Ramada"). Ramada did not note a problem with the bed frames, and Shiv-Ram apparently did not have actual knowledge of the problem with the bed frames. Shiv-Ram's conduct was not greatly reprehensible.

3. Whether the target of the conduct had financial vulnerability.
The main opinion states: "We have no information from which we can assess whether the motel guests, who would be the `target' of that total omission, were financially vulnerable." 892 So.2d at 316. Therefore, there is no evidence indicating that Shiv-Ram preyed on any financial vulnerability Linda McCaleb may have had.

4. Whether the conduct involved repeated actions or was an isolated incident.
Shiv-Ram left the bed frames in a dangerous condition for an extended period, even while staff members were bumping *328 their legs on the frames. I agree with the main opinion that, in a sense, this constitutes repeated actions.

5. Whether the harm was the result of intentional malice, trickery, or deceit, or mere accident.
The harm does not appear to have been the result of Shiv-Ram's "intentional malice, trickery, or deceit." Campbell, 538 U.S. at 419, 123 S.Ct. at 1521. Instead, it appears to have been the result of Shiv-Ram's negligence. "`"Trickery and deceit"' are `more reprehensible than negligence.'" Gore, 517 U.S. at 576, 116 S.Ct. 1589.
After thoroughly reviewing Shiv-Ram's conduct, I do not believe that its conduct was so reprehensible that it warranted a $500,000 punitive-damages award in addition to the $176,572.82 compensatory-damages award.

B. The disparity between the harm or potential harm suffered by the plaintiff and the punitive damages award.
Although the main opinion points out that ratios of up to 4:1 have been upheld against constitutional challenges, I believe that a 1:1 ratio is more appropriate in this case. The Supreme Court of the United States in TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 459, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), stated:
"`Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be much greater.'"
(Quoting Garnes v. Fleming Landfill, Inc., 186 W.Va. 656, 668, 413 S.E.2d 897, 909 (1991)).
It is undisputed that Linda McCaleb was injured, but the record indicates that the risk of serious injury was not high. The beds with the defective bed frames were in the motel long before Shiv-Ram acquired it. Several people had bumped the bed with their legs or ankles in a manner similar to the way Linda McCaleb did. One person "received emergency medical care," but we are not told the nature of this care or the severity of the injury. Thus, there is no record that anyone else received injuries similar in severity to those suffered by Linda McCaleb. Also, Linda has already been made whole by the compensatory-damages award. I believe that the low risk of serious injury counsels in favor of a modest punitive-damages award.

C. Civil penalties that could be imposed.
Because the parties concede that there is no statute that would apply to Shiv-Ram's conduct in this case, I agree with the main opinion that this factor does not apply.
In summary, I do not believe that the degree of reprehensibility of Shiv-Ram's conduct warrants a $500,000 punitive-damages award. I believe that Shiv-Ram's conduct was likely to cause only slight harm and, therefore, under TXO the damages should be small. I am not persuaded, as is the majority, that the punitive-damages award is reasonable; I would reduce the punitive-damages award to reflect a 1:1 ratio of punitive damages to compensatory damages. A punitive-damages award of $176,572.82 over and above a compensatory-damages award of $176,572.82 is quite a substantial penalty for the conduct involved.

*329 II.
Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), set out the seven factors this Court uses in determining the reasonableness, within the constitutional parameters set out in BMW v. Gore, of punitive-damages awards under Alabama law: (1) the reprehensibility of Shiv-Ram's conduct; (2) the relationship of the punitive-damages award to the harm that actually occurred, or is likely to occur, from Shiv-Ram's conduct; (3) Shiv-Ram's profit from its misconduct; (4)Shiv-Ram's financial position; (5) the cost to Linda of the litigation; (6) whether Shiv-Ram has been subject to criminal sanctions for similar conduct; and (7) other civil actions Shiv-Ram has been involved in arising out of similar conduct.

A. Degree of reprehensibility.
In considering the degree of reprehensibility of Shiv-Ram's conduct under the Hammond/Green Oil factors, we consider" `[t]he duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover-up" of that hazard, and the existence and frequency of similar past conduct.'" Green Oil, 539 So.2d at 223 (quoting Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1062 (Ala.1987) (Houston, J., concurring specially)).
Although Shiv-Ram owned and operated the motel for only one day before Linda McCaleb was injured, it had had several opportunities in the months preceding the actual transfer of ownership during which to inspect the motel. Ramada did inspect the motel and did not find a problem with the bed frames. Therefore, it appears that Shiv-Ram did not have actual knowledge of the problem before the accident. Post-incident conduct, however, may be considered in evaluating the duration component of reprehensibility. Lance, Inc. v. Ramanauskas, 731 So.2d 1204 (Ala.1999). Ray Patel, who purchased the motel from Shiv-Ram, testified that the problem with the bed frames existed for 2 1/2 years after Linda's injury. Shiv-Ram's failure to remedy the problem weighs in favor of a finding some degree of reprehensibility.
There is no evidence indicating that Shiv-Ram attempted to conceal the hazard, but there is evidence indicating that Shiv-Ram allowed the motel to fall into a general state of disrepair during the period between the execution of the purchase agreement and the closing and over the course of its ownership. Although I agree that Shiv-Ram's conduct is reprehensible, I do not believe that its conduct is reprehensible enough to warrant $500,000 in punitive damages. Therefore, I conclude that this factor weighs in favor of a finding that the punitive-damages award is excessive.

B. The relationship of the punitive-damages award and the harm that actually occurred or is likely to occur.
The main opinion concludes that Linda's injury was significant and ongoing; however, Linda testified that as a result of the injury she had a "goose egg" and a "speck of blood." In this case, as is evidenced by the frequent bumps experienced by staff members, the likely harm is slight because, although an injury is likely to occur, it is unlikely that the harm resulting from the injury would be serious; therefore, I conclude that this factor weighs in favor of a remittitur.

C. Shiv-Ram's profit from its misconduct.
I agree with the analysis of this factor in the main opinion. Shiv-Ram's savings from its misconduct were minimal, at best, *330 and those savings did not have a significant impact on its profitability. Therefore, this factor weighs in favor of a finding that the punitive-damages award is excessive.

D. Shiv-Ram's financial position; the cost to Linda of litigation; criminal sanctions; and other civil sanctions.
I agree with the conclusion reached in the main opinion that the factor of Shiv-Ram's financial position weighs  albeit modestly  against a remittitur because Shiv-Ram has liability insurance and there is no evidence indicating that Shiv-Ram would suffer any undue financial hardship as a result of the $500,000 punitive-damages award.[4] The next factor, the cost to Linda of litigation, does not support a substantial punitive-damages award, and Linda has conceded that this factor may be ignored. The criminal-sanctions factor supports a remittitur because the amount of a criminal fine assessed for like conduct is a measure of the penalty the Legislature considers appropriate, and it does not appear that Shiv-Ram's conduct subjects it to any criminal sanctions. Lance, Inc. v. Ramanauskas, 731 So.2d 1204, 1219 (Ala.1999). The other-civil-actions factor does not require a remittitur because there is no evidence indicating that Shiv-Ram has been subject to other civil actions for its conduct. A single dollar of punitive damages may not be assessed without a finding by clear and convincing evidence of willful and wanton conduct. See Ala.Code 1975, § 6-11-20(a)(punitive damages are appropriate in a "tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard the plaintiff"). Section 6-11-20(b)(3) defines wantonness as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Lance, Inc. v. Ramanauskas, 731 So.2d at 1211. Merely reciting evidence that Shiv-Ram's conduct is willful, "reckless or [in] conscious disregard of the rights or safety of others," therefore, does not alone support a punitive-damages award that is anything more than nominal.
In this case, the jury awarded Linda $176,572.82 in compensatory damages and $500,000.00 in punitive damages; a ratio of approximately 2.83:1. Although this ratio is arguably within the constitutional limits of Gore, I do not believe that it is appropriate in this situation under a Hammond/Green Oil analysis. The degree of reprehensibility is "the most important indicium" in determining whether a punitive-damages award is excessive. In this case, I do not believe that Shiv-Ram's conduct was reprehensible enough to warrant a ratio of 2.83:1. Shiv-Ram did not actually know of the problem with the bed frames, and there is no evidence of any other serious injury caused by the condition of the bed frames. The second Hammond/Green Oil factor, the relationship of the punitive-damages award to the harm that actually occurred or is likely to occur, also militates in favor of reducing the punitive-damages award because, although there is a fairly high probability of a person's being injured *331 by the bed frames, the risk that the injury will be serious is low. Again, there is no evidence indicating that anyone other than Linda required extensive medical treatment, and there is no evidence indicating why Linda required such extensive medical care for what she described as a "goose egg" and a "speck of blood." The third factor, Shiv-Ram's profit from its misconduct, also militates in favor of reducing the punitive-damages award. There is no evidence indicating that Shiv-Ram profited from this misconduct. I believe that a ratio that approaches 3:1 is excessive and that a 1:1 ratio is at the outer bound of what is appropriate in this case. I would, therefore, reduce the ratio to 1:1 and award substantial punitive damages of $176,572.82. Therefore, I respectfully dissent.
BROWN, Justice (dissenting).
I respectfully dissent from the majority's affirmance of the $500,000 punitive-damages award. Based on the record before us, I would reduce the punitive-damages award to $176,572.82, so that the ratio of punitive damages to compensatory damages would be 1:1.
STUART, Justice (dissenting).
I join Justice Houston's dissenting opinion. However, I also agree with Justice See and Justice Brown that the evidence in this case justifies at most a 1:1 ratio of punitive damages to compensatory damages.

On Application for Rehearing
HARWOOD, Justice.
The Business Council of Alabama, Alabama Bankers Association, Alabama Civil Justice Reform Committee, and Automobile Dealers Association of Alabama, Inc., jointly filed a brief on application for rehearing as amici curiae. For the most part, that brief urged some of the same arguments Shiv-Ram presented in its rehearing brief, and we are denying its application for rehearing. With respect to a concern of amici curiae that our original opinion might be susceptible to misinterpretation on a particular issue, and their request that this Court clarify that issue so as to remove that concern, the Court deems it appropriate to furnish the requested clarification. Amici curiae are apprehensive that our original opinion might be misconstrued as implying that "the contractual right to inspect the premises and records prior to the closing  to perform `due diligence'" (brief of amici curiae, p. 3) could give rise to a duty or obligation on the part of a purchaser to inspect. Amici curiae acknowledge that they understand why that is not actually the case, in the context of the specific appellate review we were called upon to undertake, but they request clarification nonetheless, as follows:
"Amici understand that Shiv-Ram did not, in this appeal, raise, argue, or brief the underlying retroactive duty issue for wantonness and[,] thus, none of these issues were (or could have been) addressed by the Court. See Shiv-Ram Reply Br. at 1 (`[W]hether or not Shiv-Ram was negligent or wanton in failing to inspect the motel in question is simply not at issue on this appeal....'). Amici are not asking that the Court address issues not properly preserved. Amici ask only that the Court clarify that the issue of whether contractual due diligence rights gave rise to a duty in tort was not challenged on appeal and [,] thus, the Court did not hold that such a duty exists."
We hereby provide the requested clarification, by confirming that the issue whether contractual due-diligence rights gave rise to a duty in tort was not raised in this appeal; consequently, we did not hold, implicitly *332 or otherwise, that such a duty exists.
APPLICATION OVERRULED.
LYONS, JOHNSTONE, and WOODALL, JJ., and GORDON, Special Justice,[**] concur.
HOUSTON and STUART, JJ., concur in the opinion issued on rehearing, but dissent from overruling the application for rehearing.
SEE and BROWN, JJ., dissent.
NOTES
[1] Dennis McCaleb has not cross-appealed the judgment entered on that adverse verdict and is not a party to this appeal.
[*] Retired Circuit Judge William R. Gordon was appointed on November 14, 2003, to be a Special Justice in regard to this appeal.
[2] Smith v. Schulte held that a statute limiting damages recoverable against a health-care provider in certain wrongful-death actions was constitutionally impermissible on a rationale analogous to the rationale of Henderson.
[3] The provisions of the new § 6-11-21 omitted from this quotation are not applicable to this case.
[4] I would note that if we are to support every award of punitive damages that is within the limits of the defendant's liability insurance, on the theory that such an award does not harm the defendant, it is difficult to understand the social policy that is being furthered. If, on the other hand, the punitive effect of a damages award can be accomplished only by a general judicial practice of punishing in an amount sufficient, first, to exhaust the limits of insurance coverage and, then, to award beyond that an amount that appropriately punishes, the effect will be to discourage the purchase of insurance. In reality, punitive-damages awards almost certainly will be reflected in a compensating increase in the insured's premiums.
[**] Retired Circuit Judge William R. Gordon was appointed on November 14, 2003, to be a Special Justice in regard to this appeal.